## Buckner v. Board of Education of Owensboro City School District.

(Decided December 19, 1930.)

EARL S. WINTER for appellant.

R. MILLER HOLLAND and ALFRED HOLMAN for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

This appeal is prosecuted from a judgment holding valid a bond issue of $200,000 duly voted by the Owensboro city school district. This bond issue is attacked because, when these bonds are issued and added to the already existing indebtedness of the district, the sum will exceed the constitutional indebtedness limit about $157,-000. The district admits that, and seeks to sustain this issue upon the idea that an emergency exists. The part of the Constitution which is involved is this:

> "Sec. 158. The respective cities, towns, counties, taxing districts and municipalities shall not be

authorized or permitted to incur indebtedness to an amount, including existing indebtedness, in the aggregate exceeding the following named maximum percentages on the value of the taxable property therein, to be estimated by the assessment next before the last assessment previous to the incurring of the indebtedness, . . . counties, taxing districts and other municipalities, two per centum (2%): . . . Unless in case of emergency, the public health or safety should so require."

To support its contention the district relies upon a certain resolution of its board of education from which this is taken:

"Whereas, . . . the population of the City of Owensboro according to the federal census of 1930 is now 22,785 people, and the necessities in the case are accordingly greater than heretofore, as evidenced by the April 1930 school census of children between the ages of six and eighteen years of age, aggregating 5,148 in number, as compared with the 1929 enrollment of 4,336 school children between the ages aforesaid—an increase of 812 of such children between the 1930 census and the 1929 enrollment thereof, of which increase the enrollment for the first school day in 1930 is greater by 360 pupils than was the enrollment on such day in 1929, inevitably suggesting that while the increase in number of pupils for the two school years next preceding the instant year was 556, that is to say 3,780 for 1927-1928, compared with 4,336 for the school year 1929-1930, as the present school year advances a still greater increase must be anticipated with ensuing burdens, disadvantages and dangers attendant on the crowded condition hereinafter set out; and

"Whereas, in August 1928 the Chief Deputy of the State Fire Marshal's Department, after inspection thereof, explained to the proper Committee of the Owensboro City School District Board of Educaiton, that it was his duty to condemn the building known as Longfellow School, one of the seven graded school buildings in the said District and erected in 1900 by a private corporation as a Girls' Boarding School, but afterwards in 1915 to accommodate the fast-growing school population of the District, acquired by the Board for Public School purposes

and saved from condemnation as aforesaid by the promise of the Board to the State Fire Marshal's office that it would erect a new building on the site recently acquired by it as soon as the electors approved the bond issue therefor, and which as in paragraph 2 above was done, but which bond issue was never made; and

"Whereas, subsequently on August 20, 1930, the State Inspector of School Buildings, in his official report to this Board, commanded the discontinuance of the use of the building as soon as possible because of its 'bad' condition, and that as per his earlier report of February 9, 1930, the present be the 'last session (as the building is) going to wreck,' and that (you must 'build a new school'; and

"Whereas, the said Longfellow School is woefully inadequate to the educational, physical and sanitary requirements of the 337 white children enrolled in grades 1 to 6, as particularly shown by the tests recently made of the vision of the school children in the Longfellow School when compared with the total enrollment of all the school children in the remaining Owensboro Schools, namely in the latter case 28.8% have normal vision, while in the former case only 12.5% have such normal vision; in all other schools 12.2% have one eye normal, in Longfellow School 11.8%; in all the schools 25.1% have defective vision in both eyes, in Longfellow School 44.6%; in all the schools both eyes defective (one above 5/10 vision, other below) 10.6%, in Longfellow School 13.2%; in all the schools, both eyes defective (vision of each below 5/10) 11.2%, in Longfellow School 17.6%; whereby the general health, welfare, physical safety are threatened, if not already jeopardized and imparied and the educational privileges denied the said pupils; and

"Whereas, the Lee School for white grade children, grades one to six, became so crowded in 1925 that the sixth grade pupils were required to be and were transferred to an adjoining District; in 1928 said school again became so crowded that the fifth grade children were required to be and were transferred outside the District; and the increased general enrollment of school children in the District above in paragraph 3 of this preamble noted, for the current year will require that the fourth grade chil-

dren be transferred to buildings of adjoining District, already overcrowded; and even if not so, the children of such fourth grade on account of their tender age could not be transferred to such Districts in many cases far away from their homes; and

"Whereas, the Western Junior-Senior High School for Colored Children with an enrollment of 231 students, is crowded into seven 'Up-stairs-rooms,' with no assembly-room, no gymnasium, no shop or opportunity for vocational work whereby the educational facilities due to them under the exigencies of a modern, industrial civilization are totally denied to them, so that the education attempted to be given them under such circumstances completely fails of its purpose and sequentially imposes on the whole body politic of the city, a burden of supporting a large number of them upon leaving the schools without the educational and vocational facilities which would have made them measurably self-supporting; and

"Whereas, unless additional school facilities are afforded, there will be a recurrence of the handicap imposed on the pupils during the year last passed whereby the first-grade rooms in three of the grade school buildings were so overcrowded that the teachers were compelled to have the pupils come to the classes in shifts—part coming in the forenoon, and the other part in the afternoon, and whereby again all of them were denied the opportunities for a reasonable education to which they are entitled, and which the taxpayers of the District by their almost unanimous vote are prepared to give to them; and anticipating a more crowded condition than existed heretofore, this Board has already provided for the division of the children of the first-grade into two groups, one of which will attend school only from 8:30 A. M. until 12:00 noon and the other from 12:00 noon to 3:00 P. M. thus continuing the denial of the educational facilities to which they are entitled; and

"Whereas, scientific proof, based upon observation and experience indisputably prove that proper educational advantages cannot be accorded in grade school classes containing more than forty pupils, and that with the necessarily limited room space in schools of the character of those of the Owensboro City School District, the crowding of more than such

numbers into any one room is prejudicial to the health, welfare and safety of the pupils, and because of the crowded conditions it has been necessary in at least twenty-one of the class-rooms in said district to have more than forty children per room, and in some cases more than fifty such pupils; and

"Whereas, there are no funds available to the Board to provide the necessary buildings, additions, improvements, and repairs to other school buildings; and the annual funds raised by taxation and other sources are not sufficient for said purposes, namely —of providing suitable grounds, school buildings and equipment, and the repair, additions and improvements to the buildings already in existence; and

"Whereas, four of the other five Grade School Districts herein border on the Longfellow District so that the new building essential to the proper and healthful housing of the children in that District will permit the extension of the boundary-line of the said District into parts of the other four Districts just above referred to, so that relief may be given to the crowded condition in such Districts by transferring certain of their pupils to the Longfellow District, thus safeguarding the health, safety and welfare of said pupils, besides effecting a great economy in avoiding the necessity for new buildings or additions thereto in the other four Districts; Now, Therefore,

"Be it resolved by the Board of Education of the City of Owensboro, Kentucky: Section 1: That, because of the just recited premises, a permanent condition of insufficiency of school service and facilities, resulting in the impairment and jeopardy of the health, safety and welfare of the more than 5000 pupils in the said schools and thereby of the entire public of the said City of Owensboro, has produced an emergency which will continue to exist unless and until it is corrected and ameliorated by the construction, repair and improvement of the school buildings in the said city."

The district by documentary evidence supported the facts set out in this resolution. Because of these things, it contends it has the right to issue these bonds even though the constitutional limit be exceeded. Certainly this district is not because of these inadequate school

facilities in a worse plight than was the school district of Williamsburg after its school building had been destroyed by fire, and it had none at all, yet, in Nelson v. Board of Education of Williamsburg, 213 Ky. 714, 281 S. W. 808, we held it could not exceed the debt limit fixed by the Constitution.

The Owensboro school district has not overlooked this Williamsburg case, and tacitly admits it is insurmountable, so they endeavored, since they could not climb over it, to go around it; therefore it relies upon the resolution of its school board noted above, and is contending that by that resolution its board of education has passed on this emergency, and that it has thereby got around the Williamsburg case and around the constitutional debt limit; in other words, it claims the right to say when such an emergency exists as the Constitution contemplates. This power, it contends, is given to it by section 10 of chapter 53, Acts of 1920, now section 3469a-1, Ky. Stats. We cannot sustain its contention.

One must have a thing before he can give it away. The General Assembly of Kentucky has not the power to annul section 158 of the Constitution, hence could not give it to this school district, and, besides, no attempt was made to do that, as will be disclosed by reading less than a score of lines of section 3469a-1. Whether such an emergency as contemplated by sec. 158 of the Kentucky Constitution exists or does not exist is a question of fact upon which the finding of the board of education is not conclusive.

The only cases in which we have ever said the alleged emergency measured up to the constitutional requirements are: Samuels v. Clinton, 184 Ky. 97, 211 S. W. 567; Id., 188 Ky. 300, 221 S. W. 1075; and Harris v. Morganfield, 201 Ky. 588, 257 S. W. 1032.

In those cases existing water plants had failed, and it was absolutely imperative that arrangements be made to obtain water, which is one of the prime necessities of life, without which life cannot be maintained. Not even water works is such a necessity where water is otherwise obtainable. See City of Marion v. Haynes, 157 Ky. 687, 164 S. W. 79, and Hurst v. Millersburg, 220 Ky. 108, 294 S. W. 788.

The judgment is reversed. These bonds are invalid, and judgment shall be entered accordingly.

The whole court sitting.