## Kentucky Utilities Co. et al. v. Ginsberg et al.

(Decided May 9, 1934.)

W. E. CABELL, J. E. SAMPSON, N. R. PATTERSON and GOR-
DON, LAURENT & OGDEN for plaintiffs.

PELHAM JOHNSTON and ARTHUR RHORER for defendants.

OPINION BY JUDGE DIETZMAN—Granting temporary injunction.

Middlesboro is a city of the third class and has adopted the commission form of government. The defendants herein are its mayor and board of commissioners. For many years the plaintiff Kentucky Utilities Company has been furnishing light and power to the inhabitants of this city. In the case of City of Middlesboro v. Kentucky Utilities Co., 237 Ky. 523, 35 S. W. (2d) 877, it was determined that the Kentucky Utilities Company had no franchise to operate in the city of Middlesboro. By agreement, however, the judgment in that litigation, which was entered in the circuit court on the mandate from this court, provided that the utilities company would be required to remove its poles and lines from the streets of the city of Middlesboro in accordance with the decision in that case only on six months' notice from the city. On July 27, 1932, pursuant to the authority vested in it by chapter 119 of the Acts of 1932, now sections 3480d-1 to 3480d-22, inclusive, of the Kentucky Statutes Supplement 1933, the city of Middlesboro enacted an ordinance providing for the construction by it of an electrical generating plant and distribution system to be financed by the sale of 6 per cent. bonds in the sum of $300,000, the principal and interest of which bonds were to be paid solely out of the net revenues derived from the operation of the plant so constructed. However, no market was found for these bonds, and, an application to the Reconstruction Finance Corporation not producing any results, the matter was allowed to lie dormant. After the United States government had provided through its Public Works Administration for loans to be made to municipalities for the construction of public works, the United States donating to the cost of such work 30 per cent. thereof, the city of Middlesboro entered into negotiations with the

United States government for a loan of $328,000, of which 30 per cent. was to be a gift of the government, the balance to be repaid with interest at the rate of 4 per cent. out of the net revenue of a municipal electric light plant and distribution system to be built from the funds thus advanced. It will no doubt be noticed that the estimated cost of the plant had risen from $300,000 to $328,000 between July, 1932, and February, 1934. This was due to the advance in cost of material and labor in that period. On February 6, 1934, there was introduced and passed on its first reading by the commissioners of the city of Middlesboro an ordinance entitled:

"An ordinance approving a loan agreement between the City of Middlesboro, Bell County, Kentucky, and the United States of America, covering a Federal loan and grant in the aggregate amount of $328,000.00, for the purpose of financing the construction of a municipal electric power plant and distribution system, and declaring an emergency."

The ordinance by its terms provided that the city of Middlesboro should accept and agree to a loan agreement drawn up by the United States government for financing the cost of constructing a municipal electric power plant and distribution system. The loan agreement is then set out in full. It is a very elaborate affair, providing for the amount of the loan, the disposition of the bonds, their security, registration, interest, and maturites, for the deposit of the bond proceeds, the retirement fund, the service rates, etc., and providing certain conditions as to the wages that were to be paid in the construction work, as to the character of labor to be employed, 'with especial reference to preferences among classes of labor, as to the number of hours the workmen were to work, as to where the materials were to be bought, and many other details not material to be here mentioned. The mayor and the city were authorized by this ordinance to execute this agreement for and on behalf of the city. By section 3 of this ordinance, it was provided that an emergency existed, requiring the ordinance to become effective forthwith upon its passage and approval, because of the need of the immediate preservation of the public peace, health, and safety. This ordinance was again passed at a special meeting of

the board of commissioners on February 12, 1934, and again at a regular meeting of that board on the next day. On that day, in accordance with the provisions of section 3480b-23 of the Statutes, a petition signed by 58 6/10 per cent. of the total number of votes cast at the last regular election for mayor was presented to and filed with the board of commissioners, asking that a referendum be held on this ordinance. The petition was ignored by the board. Thereupon this suit was brought by the Kentucky Utilities Company, J. H. Woodson, and J. M. Hurst to enjoin the mayor and the board from carrying into execution this loan agreement. The plaintiffs pitched their cause of action, first, on the ground that the ordinance in question was subject to a referendum in accordance with the provisions of sections 3480b-23 to 3480b-26, inclusive, of the Statutes, and that, unless and until the ordinance was approved by the voters at a referendum election held pursuant to these sections, the loan agreement could not be carried into execution. Secondly, on the ground that the loan agreement was itself invalid for many alleged reasons, among which may be mentioned the following: Its terms prevent free, open, and unrestricted competitive bidding as required by law; it delegates to individuals and bodies other than the board of commissioners of Middlesboro the execution of powers which are by law vested exclusively in that board. Thirdly, on the ground that the powers and duties of the board of commissioners limited and specified by the Statutes are incompatible with the express purpose of the loan agreement. A motion was made for a temporary injunction, which was denied by the circuit court, and the case is now before me on a motion to grant the temporary injunction refused by the chancellor.

Two preliminary questions must be disposed of before we reach the merits of this controversy: First, as to the contention that this case is not now properly before me. The order of the circuit court overruling the motion for a temporary injunction reads thus:

"The court being advised, it is ordered that the motion of plaintiffs for a temporary injunction be and it is hereby overruled, and the order of temporary injunction is refused. It is now certified by the court that plaintiffs have decided to make ap-

plication to a judge of the Court of Appeals for a temporary injunction in accordance with the prayer of the petition as amended.''

It is insisted that under section 296 of the Civil Code of Practice the order of the lower court overruling a motion for a temporary injunction must provide that it shall become effective on a date not exceeding 20 days from the entry of the order by the court, and that hence in the instant case the plaintiff, in the place of being granted an indefinite time within which to file a motion before a judge of the Court of Appeals for the temporary injunction refused by the chancellor, should have been restricted to a reasonable time not exceeding 20 days. Since the order did not so provide, it is contended that it does not give me, as a judge of the Court of Appeals, jurisdiction to consider the motion now made before me. The case of McCreary County v. Bryant, 173 Ky. 363, 191 S. W. 119, is relied upon. That was a case which presented the question of a reinstatement of an injunction dissolved by the circuit court. Section 296 of the Civil Code of Practice in part reads:

''If the circuit court or the judge thereof, upon the application of a plaintiff for a temporary injunction as provided for in Chapter 1 of this article, refuse to grant such injunction; or after such injunction has been granted, if the same has been dissolved, the plaintiff may within twenty days apply to a judge of the Court of Appeals for an order directing the circuit court or the judge thereof to issue such temporary injunction as may be proper, or to reinstate or modify any such injunction as may have been dissolved by such court or judge; and upon motion of the plaintiff the circuit court or the judge thereof in the order refusing or dissolving such injunction shall express in such order that the plaintiff has desired to make such application to a judge of the Court of Appeals; and shall provide that any order of dissolution shall take effect in a reasonable time thereafter, not exceeding twenty days.''

The Code clearly provides that, in the case of a motion to reinstate a temporary injunction dissolved by the chancellor, the order in the circuit court dissolving the injunction must provide a date on which the disso-

lution shall take effect not exceeding 20 days. But the Code provides equally as clearly that, where no injunction has ever been granted and the motion for a temporary injunction is overruled, all that is necessary for the circuit court to provide in its order is that the plaintiff desires to make an application to a judge of the Court of Appeals for the temporary injunction refused by the trial court. The motion must, as the Code requires, be made before a judge of the Court of Appeals within 20 days. The motion in the instant case was so made. The reason for the distinction made in the Code between the state of case where no temporary injunction has ever been issued and where one has been issued and has been dissolved by the chancellor is obvious. In the latter state of case, the Code provisions as to when the dissolution is to take effect preserve the status pending an application for reinstatement. In the former state of case, the status has never been changed by any order of court and remains of its own force in effect pending the application to a judge of the Court of Appeals. In the instant case, the order did not dissolve a temporary injunction theretofore granted. It simply refused to grant any at all. The order fully complied with the Code to give me authority to consider the motion now pending before me. The first contention of the defendants will have to be disallowed.

It is next argued that the plaintiffs in the instant case have no power or capacity to prosecute this suit. The plaintiff Kentucky Utilities Company brings this suit as a taxpayer, but the plaintiffs Woodson and Hurst join in as citizens, residents, and voters of the city of Middlesboro, and engaged in business therein. The city argues with much force and abundant citation of authority that the proposed loan agreement involving no expenditure of the taxpayers' money, since the proposed bonds are to be paid out of the net revenues of the lighting plant to be constructed by the city in its proprietary capacity, is not one which a taxpayer can question, since he has no interest as such to protect. The cases of Iowa Public Service Co. v. City of Emmettsburg, 210 Iowa, 300, 227 N. W. 514; Campbell v. City of New York, 244 N. Y. 317, 155 N. E. 628, 50 A. L. R. 1473, and Heald v. District of Columbia, 259 U. S. 114, 42 S. Ct. 434, 66 L. Ed. 852, are relied on in support of this contention. Conceding arguendo the soundness of this po-

sition of the defendants, we are yet met with the proposition as to whether or not a resident, citizen, voter, and one engaged in business in the town may maintain this action. It is argued that the city in erecting this light plant is doing so in its proprietary capacity. Even so, there must be some way where, if those charged with the duty of directing the affairs of a city in its proprietary capacity are proposing to violate the law or exceed their authority, they may be restrained from so doing. A stockholder in a private corporation would clearly have the right to prevent the board of directors of a corporation from acting ultra vires. They why should not a resident, citizen, and voter of a town have a like right if the rulers of the town undertake to act ultra vires in the execution of the proprietary activities of the town? We regard this question as settled by the case of Louisville Home Telephone Co. v. City of Louisville, 130 Ky. 611, 113 S. W. 855, 859. In that case a resident, citizen, and voter of the city of Louisville was permitted to bring a mandamus suit to compel the board of works to advertise and sell a franchise that had been voted by the council of the city of Louisville. In upholding this right, after pointing out that Coleman, as a taxpayer, was not affected even in any private right of his, the court said:

"The question in this case is therefore one of public right, and the object is the enforcement of public duty. And, as we have seen from the authorities quoted supra, in such state of case a relator in a mandamus proceeding need not show that he has any special interest in the result, but it is sufficient for him to show that he is a citizen and resident, and engaged in business in the city, and as such interested in the execution of the law, and that, inasmuch as the public duty here sought to be enforced is not one due to the state in its sovereign capacity, the decided preponderance of American authority is that private persons may move for a mandamus to enforce such public duty."

In the case of Gay v. Haggard, 133 Ky. 425, 118 S. W. 299, 301, on the same proposition the court said:

"The petition does not allege that appellant will sustain special damage, or that anybody will sustain damage by reason of the alleged conduct or

failure of the defendant to comply with the statute as to letting the work on the roads. * * * It would seem to follow that where a ministerial act was required by law to be done, which if done would inure to the benefit of the public, the tardy official might be set in motion and compelled to act by a suit by one of the public affected, suing on his own and on behalf of the others. Nor is it necessary that the plaintiff should show a special interest to be affected by the act. The reason it is public is because all the public are equally affected by it at least theoretically; and, if no one of the public could maintain the suit, none less than all could, which would be practically a denial of the right to sue, for it is scarcely possible that all the citizens of a county or other territory could be got to act together in any matter. Nor do we think it necessary to allege or to show that the public will sustain damage if the act is not done. By the enactment of a statute on behalf of the public creating an office, and providing an incumbent to discharge certain public functions, the Legislature has declared that the act is one beneficial to the public. The phase of the question is not issuable. The public pay the officer for his services. They pay for the work done upon the roads. It will not lie in the official's mouth to say that his performance of a statutory duty is not a matter of concern to the public, or that his neglect of it will not entail any damage upon the public. Nor can he ask that the public be relegated to criminal prosecutions for redress. The public needs roads, not fines. The fines are only one method of enforcing the discharge of official duty to the public; but the availability of that means will not prevent the employment of another that will get what the public are entitled to, and what was the purpose of the legislation in their behalf in that matter.''

See, also, the case of Hilliard v. George G. Fetter Lighting & Heating Co., 127 Ky. 95, 105 S. W. 115, 31 Ky. Law Rep. 1330.

In the recent case of Juett v. Town of Williamstown, 248 Ky. 235, 58 S. W. (2d) 411, although the question was not discussed, a citizen and resident of the town of Williamstown was permitted to enjoin the issu-

ance of bonds for the purpose of constructing a municipal lighting plant for that city exactly like those here proposed to be issued. We are therefore of the opinion that, whether the Utilities Company may maintain this suit or not, unquestionably the plaintiffs Woodson and Hurst have such right. We are brought, therefore, to a discussion of this case on its merits.

Was the ordinance in question of the character ordinarily subject to a referendum, and, if so, did the inclusion therein of the emergency clause relieve it from the possibility of such referendum? It is contended that the ordinance in question was not subject to a referendum, first, because it was passed pursuant to the authority vested in the cities of the third class, by chapter 119 of the Acts of 1932, now sections 3480d-1 to 3480d-22, inclusive, of the Statutes. This act does not expressly provide for a referendum in the event that the city is proposing to construct a new plant as distinguished from the purchase of an existing plant. This contention requires an analysis and construction of the act of 1932. Section 1 of this act (section 3480d-1) authorizes cities of the third class to acquire by purchase or by construction electric light plants and distribution systems. Section 2 (section 3480d-2) provides that the plants so constructed or acquired may be paid for by money borrowed on bonds authorized by ordinance. Nothing is said in this section or in any other section of the act as to how such an ordinance shall be adopted. Section 3 (section 3480d-3) of the act relates to the acquisition of an existing plant. It does expressly provide for a referendum on the action of the board of commissioners in voting to acquire an existing plant. The referendum so provided is a much more liberal referendum than that provided by section 3480b-23 of the Statutes, which relates to ordinances of the city of the third class concededly subject to a referendum. Under this section 3480b-23, 25 per cent. of the total number of votes cast for both candidates for mayor at the last preceding regular election for mayor must sign the referendum petition. Under section 3 of the 1932 act, it is only necessary to have 200 signers to the referendum petition. The reasons for this liberalization are patent. In the purchase of an existing plant, there is no competition save the indirect competition created by the possibility of the city erecting its own

plant should the cost of the existing plant be too high, and the matter of the purchase is one of bargaining and negotiating, the only check upon which is a liberal referendum. On the other hand, if a new plant is to be erected and the work has to be let in competitive bidding to the lowest responsible bidder, then the only real question of interest to the voter is whether the city shall embark on municipal ownership or not. In such state of case, if a referendum is to be allowed at all, there is no reason why a more strict one than that required for the acquisition of an existing plant should not be imposed. Therefore the silence of the act of 1932 as to a referendum where a plant is to be constructed, the act providing for one where an existing plant is to be acquired, is not of itself conclusive that the Legislature did not intend that an ordinance providing for the original construction of a plant should not be subject to a referendum.

Sections 4, 5, 6, 7, and 8 of the act of 1932 (sections 3480d-4 to 3480d-8), deal with the character of the bonds to be issued for the acquisition by purchase or construction of the plant, the disposition of the proceeds of such bonds, their security, interest rate, freedom from taxation, the liens back of them, and how such liens are to be enforced; sections 9 and 10 of the act (sections 3480d-9, 3480d-10) relate to the fund to be raised to pay the bonds, to the transfer of the surplus funds. The other sections of the act, save section 19 (section 3480d-19), are not material to our discussion here, except that it may be said that nothing is said in this act about the work and materials when the plant is to be originally constructed, being let at competitive bidding to the lowest responsible bidder or bidders as is generally required by section 3440 of the Statutes of all expenditures of cities of the third class in excess of $500. Section 19 of the act of 1932, now section 3480d-19 of the Kentucky Statutes Supplement 1933, provides:

"This act shall be deemed to create an additional and alternate method for the acquisition of an electric light, heat and power plant by any city of the third class and shall not be deemed to include, amend, alter, or repeal any other statute. No proceedings shall be required for the acquisition of any electric light, heat and power plant hereunder or the issuance of bonds hereunder except such as

are prescribed by this act, any provision in the general laws of the Commonwealth of Kentucky or the charter of any city to the contrary notwithstanding."

It is argued that, since the act itself says that no proceedings shall be required for the acquisition of any electric light plant, except such as are prescribed by the act, and nothing is said in the act about a referendum where the original construction of a plant is involved, the need of a referendum in such state of case is eliminated. On the other hand, it is argued that the first sentence of this section 19 of the act of 1932 provides that the act shall be deemed to create an additional and alternate method for the acquisition of electric light plant, and shall not be deemed to include, amend, alter, or repeal any other statute, whence it follows that all the provisions of charters of the third class not inconsistent with the act of 1932 necessarily are in full force and effect and are applicable to the proceedings provided for by that act. The proper construction of this section 19 of the act is one of difficulty. But of this we are sure. Where the act of 1932 prescribes the proceeding, but is silent as to the details of such proceeding, we must not only by the first sentence of this section 19, but also in the very nature of things look to the other provisions of charters of cities of the third class to ascertain what, if any, details are provided for such proceeding. Thus the act of 1932 provides that the question of the acquisition of an electric plant by original construction or by purchase of an existing plant, and the issuance of bonds to pay therefor, must be determined by ordinance. This is the proceeding prescribed. But the details of how that ordinance is to be passed are nowhere to be found in the act. Clearly an ordinance such as provided for by the act of 1932 must be passed in some fashion, and, the act of 1932 being silent in such respect, the only way the ordinance can be passed must be in accordance with the ordinary charter provisions of cities of the third class. Necessarily we must look to the other provisions of charters of cities of the third class to supply the details so omitted. When we do, we find, in cases of the commission form of government as here, first, section 3480b-14 of the Statutes, which reads:

"Every ordinance or resolution ordering the con-

struction or reconstruction of any street or sewer, or other public work, or making or authorizing any contract involving the expenditure of more than five hundred dollars [$500.00], * * * shall, after its introduction and before its adoption, remain on file at least one week for public inspection in the completed form in which it shall be put upon its final passage; and no such ordinance or resolution shall go into effect until the expiration of ten days after its passage, except in case of emergency, the public health or safety shall require it to take immediate effect, which fact shall be declared by the unanimous vote of the board of commissioners.''

We are then confronted by section 3480b-23 of the Statutes, which, so far as pertinent, reads:

''If during the ten days next following the passage of any such ordinance as cannot within said ten days become effective, a petition-signed by a number of voters equal to at least twenty-five per centum [25%]. of the total number of votes cast for both candidates for mayor at the last preceding regular election for mayor * * * shall be presented to the board of commissioners, protesting against the passage of such ordinance, such ordinance shall be suspended from going into effect and shall be reconsidered by the board of commissioners. If such ordinance be not then repealed the board shall submit to the voters of the whole city, at either a special or regular election, according to law, the following question: 'Shall the ordinance (briefly describing it), go into effect?' and if a majority of the votes cast upon such question be in the negative, the ordinance shall not go into effect. But if a majority of the votes cast upon such question be in the affirmative, the ordinance shall go into effect as soon as the result is officially ascertained and declared.''

We thus see that an ordinance of the character of that here in question is one that must be introduced and then allowed to lie over for a week, and which, after its final adoption by the board of commissioners, does not become effective for 10 days. If within that time the necessary referendum petition is filed, then the ordinance does not become effective until the people vote upon it. By the express wording of section 3480b-23 of

the Statutes, it is only when the majority of the votes cast at the referendum vote in favor of the ordinance that the ordinance is effective, the exact words of the statute being:

"The ordinance shall go into effect as soon as the result is officially ascertained and declared."

Of course, where a detail in conflict with these details is prescribed by the act of 1932, the act of 1932 will control as to such detail, an example of which is the referendum provided in the act of 1932, where the acquisition of an existing plant is involved. But the act is silent as to the details of the passage of an ordinance for the original construction of a plant. The referendum of section 3480b-23 is as much a detail relating to the passage of ordinances covered by section 3480b-14 as is any other detail relating to such passage. Indeed, as we have seen, an ordinance subject to a referendum is not effective for 10 days after its passage, and, if a referendum is duly requested in that time, the ordinance is not effective until a majority of those voting in the referendum vote in favor of the ordinance. We are therefore of the opinion that the act of 1932 does not exclude a referendum in cases of the character like that here involved, and that such is prescribed by the workings of sections 3480b-14 and 3480b-23 of the Statutes.

We are further of the opinion that the ordinance providing for the loan agreement falls squarely within the provisions of section 3480b-14. The argument that this ordinance is but an amendment of the ordinance of July, 1932, will not bear analysis. So totally different is the ordinance of 1934 from that of 1932 that the former cannot by any stretch of argument be considered an amendment of the latter ordinance. The amount of bonds is different; the rate of interest is different; the way the money is to be expended is different; the terms and conditions under which it is to be expended are different. About the only thing the two ordinances have in common is the fact that the city proposes to erect an electric light plant. The ordinance of 1932 was clearly abandoned, and the ordinance of 1934 was substituted in its place. That the ordinance of 1934 is one providing for a public work or the expenditure of over $500 is self-evident; and hence it is that it falls within the provisions of section 3480b-14. The case of Shipp v. City

of Lexington, 212 Ky. 702, 279 S. W. 1094, does not militate against these views. That case simply holds that an ordinance directing the condemnation of land for the purpose of widening a street is not one that must lie over for 10 days, and hence by deduction is not one subject to a referendum. The distinction between that case and the case here present is obvious. A condemnation ordinance merely provides for the condemnation of land. When the judgment of condemnation is entered and the price to be paid is fixed, the city yet has the option of taking the land and paying the price or not. If it elects not to take the land, then no public work is done or expenditure incurred, other than the costs of the action. If it elects to take the land, then it must by ordinance provide for the payment therefor, and, if the amount is sufficient to bring the ordinance within the referendum provisions, then it will be subject to such referendum. The ordinance here in question, however, provides not only for a public work, but also for an expenditure of over $500. The Lexington Case is not controlling.

The only remaining question to be determined is whether or not the provisions of section 3 of the ordinance of 1934, setting out "an emergency" above quoted, eliminated the necessity of this ordinance lying over 10 days, and so took it without the referendum provisions of charters of cities of the third class.

It must not be forgotten that this ordinance was passed pursuant to the authority of the city to acquire an electric light plant. Under the statute, that is necessarily the purpose of the ordinance, and hence the reasons supporting the "emergency clause" of the ordinance must be exclusively those relating to the need of an immediate acquisition of an electric light plant. The reasons which may support an emergency clause in an ordinance are defined by the statute, section 3480b-14, to be the needs of "the public health and safety." These are precisely the same reasons couched in the same language found in section 158 of the Constitution which authorize in case of an emergency a municipality to exceed the debt limits prescribed by that section of that instrument. In construing that language of the Constitution, in the case of Samuels v. City of Clinton, 184 Ky. 97, 211 S. W. 567, 569, a case involving the acquisition of an existing electric light plant, which was about

to be dismantled and which was the only one serving the city, the court said:

"This court has never, except in general terms, defined what an emergency must be or of what circumstances it must consist to authorize a municipality to incur indebtedness in excess of the amounts prescribed for it by section 158, supra. The emergency by the terms of the Constitution is limited to perils to the public health and safety, and eliminates any mere apparent necessities growing out of conveniences or out of conditions which are merely inconvenient to be borne. * * * An emergency is defined in 15 Cyc. 542, to be:

" 'Any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency; a sudden or unexpected happening; an unforeseen occurrence or condition.'

"In City of Marion v. Haynes [157 Ky. 687, 164 S. W. 79], supra, it was said:

" 'In treating the subject of taxation, the Federalist, in No. 36, said: "There are certain emergencies of nations in which expedients that in the ordinary state of things ought to be foreborne become essential to the public weal." This language, no doubt, expresses the idea of the framers of our Constitution, since they evidently meant that an emergency was some pressing necessity out of the ordinary state of things, which could only be remedied by the use of unusual expedients.'

"Section 158, supra, does not contain any technical terms, and, being a provision of the Constitution, adopted by a popular expression of the people at large, its terms should be given a meaning in accordance with their usual and customary signification, and in accordance with their fair intendment. * * *

"While an electric light plant and a system of electric lights is a great convenience and a most delightful and desirable luxury to the inhabitants of a municipality of the fifth class, the necessity of having one for safeguarding the public health or public safety is not so great as to create an emer-

gency, which would authorize the municipality to create an indebtedness beyond the 3 per cent. fixed by section 158 of the Constitution.''

In the case of City of Marion v. Haynes, 157 Ky. 687, 164 S. W. 79, 84, we said:

"And while we will not undertake to lay down a rule by which an emergency under section 158 of the Constitution is to be determined in every case, it is apparent that such an emergency is some sudden or unexpected occasion for action, some unforeseen occurrence, condition, or pressing necessity that requires immediate attention.''

See, also, Buckner v. Board of Education of the City of Owensboro, 236 Ky. 768, 34 S. W. (2d) 236.

It is impossible to distinguish this case from the City of Clinton Case, supra. Convenient as an electric light plant is and inconvenient as it would be to be deprived of its service, yet it is not apparent how the public health and safety will be imperiled by the delay necessary to be incurred in permitting a referendum petition to be filed and an election to be held thereon. The plant cannot be immediately constructed. In this, the instant case is stronger than the Clinton Case, supra, for there the plant, already in existence, could be promptly acquired. It will, at the best, take a very appreciable amount of time to erect this plant and construct the distribution system. The additional time needed for the referendum will not adversely affect the public health and safety. As it is only how they will be directly affected by the lack of electric service due to delay that we may inquire into, and as we have seen that the mere inconvenience the public will be put to is not a consideration in the determination of such question, it follows that the emergency clause appearing in section 3 of the ordinance was and is of no effect and did not serve to take this ordinance without the referendum provisions of the Statutes. Further, the record discloses that the town is being served with electric service, which the company volunteers to maintain until required to discontinue in accordance with the judgment entered in the City of Middlesboro Case, supra. So it is apparent that the inhabitants will not even be put to any inconvenience caused by a delay in taking this referendum vote. We therefore conclude

that the ordinance of 1934 here sought to be enjoined cannot be carried into effect and the loan agreement therein provided for executed pursuant to its authority unless and until a referendum election has been held upon it as the statute requires and the voters have voted in its favor. This being our conclusion, it is unnecessary to pass on the other questions presented by this record; they being expressly reserved. It is, therefore, my order that a temporary injunction issue here·n, enjoining until further orders of court the defendants from taking any steps to carry out or to perform any of the terms, provisions, or conditions set out in the loan agreement ordinance of February, 1934, unless and until a referendum according to the Statutes in such cases made and provided shall have been held and a majority of the voters voting thereon have voted in favor of such ordinance. The plaintiff will execute bond conditioned according to law before the clerk of the Bell circuit court in the sum of $1,000.

The whole court, with the exception of Judge Thomas, who was absent, sat with me in the consideraion of this motion and concur in this order.