KEIGLEY et al. v. BENCH, City Recorder.

No. 6061.   Decided April 19, 1939.   (89 P. 2d 480.)

70

George W. Worthen, of Provo, for plaintiffs.

Brockbank & Pope, of Provo, Elias Hansen, of Salt Lake City, and Stuart P. Dobbs, of Ogden, for defendant.

McDONOUGH, Justice.

Plaintiffs are petitioners for a writ of mandamus and a writ of prohibition in aid thereof to compel the defendant to issue "petition copies" of a referendum petition and to do all other ministerial acts provided for by statute, for the purpose of referring to the voters of Provo City an ordinance passed by the Board of Commissioners of said city on the 5th day of August, 1938, making certain changes in an ordinance approved by the voters of Provo City October 13, 1936, at a special election held pursuant to the initiative and referendum statutes of the state, authorizing issuance of bonds to finance the construction of a municipal electric plant and system. The latter ordinance was before this court in *Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191.

Defendant refuses to comply, giving as the reason therefor that the changes made in the ordinance by the commissioners relate to administrative matters within the discretion of the Board of Commissioners as to which there is no right to a referendum. Plaintiffs contend that any ordinance ordained by the governing body of a municipality is subject to referendum under R. S. Utah 1933, 25-10-21, and that the right is not restricted to ordinances legislative in nature

but extends as well to such as are administrative and executive in character. They contend further that even though it be held that only legislative ordinances are within the purview of the statute the ordinance in question must be referred on proper demand.

Plaintiffs do not argue that the duties imposed upon the City Recorder by such statute must be performed by him upon demand, regardless of the subject matter embodied in the petition for referendum. Both sides take the position that the refusal of the defendant to take the initial step to set in motion the machinery provided ■ by law to effect a reference raises the question as to whether the ordinance is within the purview of the statute. In this we think they are correct. In *White* v. *Welling*, 89 Utah 335, 57 P. 2d 703, 705, in discussing the duties of the Secretary of State under the act in question this court said:

"The acts required to be done by the secretary of state, at least under this stage of the procedure provided by the law, are ministerial, and he has no discretion, except in so far as to determine whether the document or instrument submitted and purporting to contain the proposed law to be initiated has the semblance of a law, *or is such a matter as is not properly the subject of the Initiative and Referendum Act.* That is to say, the secretary of state would not be required, for instance, to submit to the people * * * (d) some matter which was not contemplated by the Initiative and Referendum Act, such as a proposed amendment to the Constitution. See *Hodges* v. *Dawdy,* 104 Ark. 583, 149 S. W. 656; *Brazell* v. *Zeigler,* 26 Okl. 826, 110 P. 1052." (Italics added.)

If Section 25-10-21, R. S. U. 1933, subjects all ordinances to the referendum, then proper demand for the reference of an ordinance gives rise to the duty of performing the acts specified in the statutes. If it contemplates the reference only of ordinances which are legislative in nature, then if the subject matter of a petition is an administrative act of the commission, he may rightly refuse to perform the duties prescribed by the statute. In such case, his duty to act does not arise since he is asked to refer that which is

not subject to referendum. It is admitted that proper steps have been taken by petitioners to entitle them to their writ if the ordinance is such as Section 25-10-21 contemplates.

The original bond ordinance provided for the issuance of bonds to the amount of $850,000 at 4½ per cent interest, payable from revenue of the electric power system, the construction of which was contemplated, and in amounts specified beginning Oct. 1, 1939, and ending Oct. 1, 1951, interest payments to begin April 1, 1937; and provided for annual allocations to a sinking fund to pay interest and principal. The bonds were to be dated October 1, 1936. Litigation which pended until May, 1938, held up the issuance of the bonds and the commencement of the project. Thereafter, as recited, an ordinance was passed making the changes here questioned.

Four changes were made by the ordinance of August 5, 1938: (1) It provided that the bonds shall be dated the first day of the month in which the issue or any part thereof is delivered to the purchaser, instead of October 1, 1936; (2) The first bonds are made to mature three years after the date of issue, instead of Oct. 1, 1939; (3) The bonds were made payable over a period of twenty years while the original ordinance provided for their payment over a fifteen year period, thus reducing the amount of the annual principal payments and increasing the number thereof from thirteen to eighteen, and provided for corresponding changes in the annual amounts set aside in the sinking fund; (4) It provided for power of call of the bonds by the City of Provo in inverse numerical order on any interest payment date by paying principal and interest due, plus a premium equal to one year's interest.

Has the defendant the right to deny referendum on these changes?

We have definitely intimated that under R. S. Utah 1933, 25-10-21, only ordinances which are legislative in character must be referred. In *Keigley et al.* v. *Bench,* 90 Utah 569, 63 P. 2d 262, we held that the resolution question was legis-

lative in character and therefore subject to referendum, citing McQuillin on Municipal Corporations (2nd Ed.) Sec. 366, p. 407, and 43 C. J. 585, which confine the referendum to legislative acts.

It is pointed out by plaintiffs that in that case the question before the court was whether a resolution legislative in nature was referable and that the question of whether an ordinance administrative in character is likewise subject to referendum is not there decided. They contend that the wording of the statute clearly and specifically confers the power of referendum as to non-legislative ordinances. We do not think so.

Section 25-10-21, R. S. U. 1933, is entitled "Direct Legislation in Cities and Towns." It reads:

"Subject to the provisions of this chapter, legal voters of any city or town, in such numbers as herein required, may initiate any desired legislation and cause the same to be submitted to the law-making body, or to a vote of the people of such city or town for approval or rejection, or may require any law or ordinance passed by the law-making body of such city or town to be submitted to the voters thereof before such law or ordinance shall take effect."

Plaintiffs take the position that while the portion of the section providing for initiative limits the same to legislation, the words "any law or ordinance" used relative to the referendum comprehends any action of the City Commission embodied in an ordinance. However, such construction overlooks the modifying clause of the sentence wherein such words are used. It does not say baldly that any law or ordinance may be required to be submitted. Nor does it so say relative to any law or ordinance passed by the governing body of a city. It is a law or ordinance passed by "the law making body" of the city with which the section deals. That is, the legislature, contemplating the governing body of a city as having administrative and executive functions as well as those legislative in nature, had in mind such actions of that body as constitute it a "law making," a legislative body. The wording, we think, clearly

expresses the intention to limit the referendum to the acts of the governing body performed in the execution of its function as a "law making" body. This construction is clearly indicated by reference to Section 1 of Article 6 of the Constitution of Utah. Article 6 is entitled, "Legislative Department." Prior to 1900 the legislative power was by Section 1 thereof vested in the legislature. Such section was amended in that year to vest such power in the legislature and the people, and provided for the initiative and referendum. The paragraph of the section vesting these powers in any legal subdivision of the state uses identical language to that contained in Section 25-10-21, except that the words "legal subdivision" are used where "city or town" are used in the statute. It seems to us clear that the intention evidenced by such amendment was to vest legislative power—and such power only—directly in the people, and that the subsequent enactment by the legislature of a statute substantially identical in language leaves little doubt as to its intent. We, therefore, construe the language of such statute to apply only to laws, ordinances, resolutions or motions which are legislative in character. The reader is referred to the following cases which so limit the application of a statute, ordinance, or constitutional provision relative to the initiative and referendum, some of which enactments are not as clear in expression as to the limitation as our own. *Murphy* v. *Gilman,* 204 Iowa 58, 214 N. W. 679; *Hopping* v. *Council of Richmond,* 170 Cal. 605, 150 P. 977; *Dwyer* v. *City Council of Berkeley,* 200 Cal. 505, 253 P. 932, 934; *McKevitt* v. *City of Sacramento,* 55 Cal. App. 117, 203 P. 132; *Riedman* v. *Brison,* 217 Cal. 383, 18 P. 2d 947; *Whitbeck* v. *Funk,* 140 Or. 70, 12 P. 2d 1019; *Monahan* v. *Funk,* 137 Or. 580, 3 P. 2d 778; *State* v. *Charles,* 136 Kan. 875, 18 P. 2d 149; *Yarbrough* v. *Donaldson,* 67 Okl. 318, 170 P. 1165; *Brazell* v. *Zeigler,* 26 Okl. 826, 110 P. 1052; *People* v. *Kapp,* 355 Ill. 596, 604, 189 N. E. 920; *Oakman* v. *City of Eveleth,* 163 Minn. 100, 203 N. W. 514; *Dooling* v. *City Council of Fitchburg,* 242 Mass. 599, 602, 136 N. E. 616, 617; McQuillin on Municipal

Corporations (2nd Ed.) Sec. 366; 43 C. J. 585. The reason for such rule is well stated in the Dooling Case, supra:

"As a matter of practical administration of municipal affairs this interpretation is the only one which would render the referendum a workable measure. If every dissatisfied bidder or disappointed applicant for municipal work could invoke the machinery of the referendum of the statute, thereby suspending the taking effect of the measure thus assailed, efficiency and economy in the business administration of a city would be seriously affected. This consideration has led courts of some other jurisdictions to go far in restricting municipal referendum to legislative acts."

To hold otherwise would so seriously interfere with municipal government and administration that we could not espouse the view without explicit statutory pronouncement, despite the holdings or intimations of some jurisdictions extending the referendum into actions of an administrative character. *State* v. *City of Bellingham*, 183 Wash. 439, 48 P. 2d 602; *State* v. *City of Tacoma*, 184 Wash. 160, 49 P. 2d 1113, (But see *Neils* v. *City of Seattle*, 185 Wash. 269, 53 P. 2d 848, 849); *Dickson* v. *Hardy*, 177 La. 447, 148 So. 674, 677; *State* v. *Davis*, 41 S. D. 327, 170 N. W. 519.

But it remains to decide whether the changes in the bond ordinance constituted legislative changes or are such as the Board of Commissioners, in its administrative capacity, could make. Numerous cases have laid down general tests for the distinction between legislative and administrative ordinances. *Monahan* v. *Funk*, supra; *State* v. *Charles*, supra; *Whitbeck* v. *Funk*, supra; *Campbell* v. *City of Eugene*, 116 Or. 264, 240 P. 418; *Yarbrough* v. *Donaldson*, supra; *People* v. *Graham*, 70 Colo. 509, 203 P. 277; *Oakman* v. *City of Eveleth*, supra; *Hopping* v. *Council of City of Richmond*, supra; *Long* v. *City of Portland*, 53 Or. 92, 98 P. 149, 1111; 43 C. J. 585, Sec. 952. The general tests are such as these:

"The crucial test for determining what is legislative and what is administrative is whether the ordinance is one making a new law,

or one executing a law already in existence." *Whitbeck* v. *Funk*, supra [140 Or. 70, 12 P. 2d 1020].

"The general rule has been stated as follows: 'Acts constituting a declaration of public purposes and making provisions of ways and means of accomplishment may be generally classified as calling for the exercise of legislative power.' 43 C. J. 585." *State* v. *Charles*, supra [136 Kan. 875, 18 P. 2d 150].

"In determining whether the ordinance in question was legislative or administrative, we notice that the authorities in the books are in accord that actions which relate to subjects of a permanent or general character are considered to be legislative, while those which are temporary in operation and effect are not." *Monahan* v. *Funk*, supra [137 Or. 580, 3 P. 2d 779].

It is apparent that here, where we are examining the original ordinance in juxtaposition to that enacted on August 5, 1938, to determine whether the changes made are legislative or administrative, the determinative test is the first. Does the later ordinance make a new law or execute one already in existence? The answer to the question should, we think, be sought by inquiring whether such changes may reasonably be viewed as clearly within the ambit of the voters' intention when the original ordinance was adopted by them. Certain it is that these changes involve such details of the entire scheme as could have been left to the discretion of the Board of Commissioners had provision been made, either by statute or in the ordinance. *State* v. *City of West Palm Beach*, 127 Fla. 849, 174 So. 334 (maturity dates) ; *Hogan* v. *City of Corning*, 217 Iowa 504, 250 N. W. 134 (manner of financing and details of construction) ; *Commissioners of Public Works* v. *Bank of Dorchester*, 115 S. C. 183, 105 S. E. 32 (interest rate) ; *Tyson* v. *Salisbury*, 151 N. C. 468, 474, 66 S. E. 532 (date of maturity) ; *Clark* v. *City of Los Angeles*, 160 Cal. 30, 116 P. 722 (date of maturity) ; *Radford* v. *Heth*, 100 Va. 16, 40 S. E. 99 (Interest and period for which bonds issued) ; *Village of Bronxville* v. *Seymour*, 122 App. Div. 377, 106 N. Y. S. 834 (interest rate) ; *City of Vernon* v. *Montgomery*, Tex. Civ. App., 265 S. W. 188 (date of ma-

turity) ; But see *Hansard* v. *Green,* 54 Wash. 161, 103 P. 40, 24 L. R. A., N. S., 1273, 132 Am. St. Rep. 1107, and *State* v. *Clausen,* 87 Wash. 111, 151 P. 251 (time bonds are to run, rate of interest and manner of payment must all be included).

Here, however, the ordinance submitted included the date of the bonds, their maturity dates with the period for interest and the total time the bonds should run. There is very respectable authority holding that even though a question submitted to the voters includes matters which are superfluous, those matters are binding on the body carrying out the ordinance. *Madera Irr. District* v. *Miller & Lux,* 9 Cir., 47 F. 2d 61; *Mann* v. *City of Artesia,* 42 N. M. 224, 76 P. 2d 941, 944; *Oklahoma Utilities Co.* v. *City of Hominy,* 168 Okl. 130, 31 P. 2d 932, 935; *Percival* v. *City of Covington,* 191 Ky. 337, 342, 230 S. W. 300. In *State* v. *Salt Lake City,* 35 Utah 25, 99 P. 255, 18 Ann. Cas. 1130, the superfluous provision was invalid, and in *City of Santa Barbara* v. *Davis,* 6 Cal. App. 342, 92 P. 308, the matter covered was reserved to the city by statute and neither case is applicable here in this respect.

We believe, however, the scope of the discretion of such body when acting pursuant to direct legislation is as indicated above. If it is clearly deducible that the variation is pursuant to the intended purpose and policy expressed by the voters then such variation is administrative; if not, then it is to that extent legislative. It seems clear that when it is sought by rule, resolution, or ordinance to vary the terms of a proposition as voted by the electors, there is a right to have the variance referred if it relates to matters which probably influenced the vote of the electors. *Percival* v. *City of Covington,* supra, at page 343 of 191 Ky., 230 S. W. 300; *Mann* v. *City of Artesia,* supra, at page 944 of 76 P. 2d; *Skinner* v. *City of Santa Rosa,* 107 Cal. 464, 40 P. 742, 745, 29 L. R. A. 512. We do not think, however, that it would be necessary for us to find that the inclusion of the variance in the proposition submitted to the voters might probably result in a rejection of the proposition itself

in order to hold the variance referable. If there is such a material departure from the referred ordinance as to constitute such a policy change as is not within the evident intent of the voters, then such departure cannot be said to be other than legislative. However, it is not unwarranted to assume that a variance, more favorable to the city than the submitted ordinance, is in conformity with such intent and hence that such a change presents no valid grounds for referendum. See *Miller* v. *Town of Bernice,* 186 La. 742, 751, 173 So. 192; *First National Bank of Laramie* v. *City of Laramie,* 25 Wyo. 267, 168 P. 728, 730; *State* v. *City of West Palm Beach,* supra.

The variations which give plaintiffs concern must be examined in the light of the principles above enunciated.

Plaintiffs point out the proviso to be inserted in the bonds by virtue of the August 5, 1938, ordinance authorizing Provo City to call any outstanding bonds in inverse numerical order by paying the principal, interest due, and a premium equal to one year's interest. The original ordinance provided that the bonds "shall be in substantially the following form" and then set out the provisions of a proposed bond. This seems to have authorized changes in form which are not substantial. In any case, we think that the provision in question, since it permits the call and refunding of bonds at advantageous interest rates and gives to the City of Provo the option to shorten the period for retirement of the bonds, is one which clearly does not increase the burdens of the city and its adoption constitutes a variation, within the rule stated above, which is administrative and hence not subject to referendum.

Plaintiffs contend they are entitled to referendum because the date of the bonds and the dates of interest and principal payments were advanced. Under the original ordinance the bonds were to be dated October 1, 1936, the first payment of interest was due April 1, 1937 and the first payment of matured bonds on October 1, 1939. Without reference to dates, this provided for payment of

interest every six months from the date the bonds were to bear, and for maturity of a specified amount of the bonds annually, beginning three years after the date of approval of the ordinance. The changes as to these payments, made by the August, 1938, ordinance, are that the interest shall be payable every six months after the first day of the month in which the bonds are issued and bonds shall mature annually beginning three years after the first day of the month of issue. Under the provisions of the original ordinance the bid of John Nuveen and Company for the bond issue is accepted. That bid was at the price of par and accrued interest to the date of delivery. The interest and principal of the bonds were made payable out of a special fund to be derived from the operation of the proposed electric power and light system. It seems clear to us that the variations in these respects are definitely pursuant to the legislative intent. They comport with the legislative policy and purpose expressed in the original ordinance. They apply to a scheme of interest and maturity approved by the voters, but without reference to the date of the election. The voters believed they were putting a plan into effect in October, 1936, and that the operation of the system would produce the revenue to pay the interest on and to retire the bonds. Were the bonds to be issued at this time to be dated October 1, 1936, the bidder would be required to pay therefor par plus accrued interest, which accrued interest would be immediately payable to the holder of the bonds. But a principal payment would have been due October 1, 1939, payable out of funds to be derived from a system not yet constructed. To say that a change which would make the expressed legislative policies and purposes effective would probably have changed votes favorable to such policies and purposes is unreasonable. We think it clear that this variation was not such as would influence the voters, and assuming no change of sentiment—which we must assume—the vote on the undated proposal would be the same as on the proposal dated as of the election month.

There is support for this view in decided cases which hold that changing the dates of the bonds without altering the financial scheme is an administrative change which does not conflict with the edict of the voters. *State* v. *Jennings et al.,* 48 Wis. 549, 553, 4 N. W. 641; *City of Oxnard* v. *Bellah,* 21 Cal. App. 33, 130 P. 701, 703; *Cook* v. *City of Louisville,* 260 Ky. 474, 477, 86 S. W. 2d 157; *Yesler* v. *City of Seattle,* 1 Wash. 308, 25 P. 1014, 1019. This change is rather similar to changing the denominations of authorized bonds without affecting the total amount issued or the amount maturing annually, which has been held unobjectionable. *Law* v. *San Francisco,* 144 Cal. 384, 77 P. 1014; *Derby & Co.* v. *City of Modesto,* 104 Cal. 515, 38 P. 900; *City of Santa Barbara* v. *Davis,* 6 Cal. App. 342, 92 P. 308.

There is some further basis of support for this change since the question submitted to the voters in October, 1936, referred to the bid made by John Nuveen and Company of Chicago, Illinois, and that bid recited: "Said bonds to be dated October 1, 1936 (or such other date as may be mutually satisfactory * * *"). There is implicit in this leaving open the date the further idea that the dates for interest payment and bond maturities will vary with the date of issue. It is likewise clear, as pointed out, that it conforms to, rather than contravenes, the policy enunciated by the voters.

Lastly, plaintiffs urge that the change in the financial plan which results in its stretching over twenty years and eighteen annual payments of principal, instead of fifteen years with thirteen annual payments, should be submitted to the electors of Provo City. We find this to be more substantial than the other changes. Defendant argues that this benefits the city by reducing the annual payments and still leaving the city free to call bonds as fast as the city is able to retire them. There is substance to this contention. Yet the scheme involved in the 1938 ordinance remains even with the call feature added, one of twenty year financing rather than one of fifteen. The call provision, as

pointed out above, would enable the city to refund the bonds if favorable changes in interest rates prevail at some time in the future, and thus is of advantage to the city. Whether a twenty year or a fifteen year financing plan is preferable is a financial and economic question, as to which reasonable minds might differ. It might be argued in favor of the one that it would be on the safe side of the proposed plant's earning capacity—and for aught that appears this change may have been made with this thought in mind. As to the other, it might be argued that it would enable the city to pay for the plant over the longest period of time consistent with freeing its net income for future modernization and for additional plant capacity necessitated by the needs of a growing community. Many people might feel that it is preferable to pay greater amounts annually and reduce the total interest paid thus compelling economy, rather than to extend the payments over a greater number of years. The policy of the voters relative to the means and manner of financing the proposed plant is enunciated in their legislative enactment of October, 1936. That financial policy is departed from in the subsequent ordinance. The enactment of the twenty year plan is not administrative of the legislated fifteen year plan. If such a change is adhered to, the voters are entitled to a referendum on the change. It goes beyond administrative detail and into the field of legislative policy. *City of North Sacramento* v. *Irwin,* 94 Cal. App. 652, 271 P. 788, 272 P. 767; *Cairo & St. Louis R. Co.* v. *City of Sparta,* 77 Ill. 505, 508; *Town of Big Grove* v. *Wells,* 65 Ill. 263, 266.

Plaintiffs rely strongly on two recent Kentucky cases in support of their position as to the several changes challenged: *Kentucky Utilities Company* v. *Ginsberg et al.,* 255 Ky. 148, 72 S. W. 2d 738; and *Board of Commissioners of City of Middlesboro* v. *Kentucky Utilities Company,* 267 Ky. 99, 101 S. W. 2d 414, being two phases of a municipal electric light plant controversy.

An examination of the first of these reveals that the ordinance which it was held was referable was, as stated by the Kentucky court, so totally different from the earlier one under consideration "that the former cannot by any stretch of argument be considered an amendment of the latter." 72 S. W. 2d at page 743. The second case but held that an ordinance passed, evidently to avoid the effect of the ruling in the Ginsberg case, was not materially different from that held referable in such case, and hence was governed similarly by the statute of Kentucky relating to referendum.

It is the conclusion of the court, therefore, that the ordinance passed by the Board of Commissioners of Provo City on August 5, 1938, embodying as it does legislative matter, is subject to referendum, and, hence, that a peremptory writ should issue commanding its submission as requested by plaintiffs. Costs to the plaintiffs.

Such is the order.

PRATT, J., concurs.

WOLFE, Justice (concurring).

I concur in the opinion of Mr. Justice McDonough except as to the order made. I think the order should require only the legislative parts of the ordinance to be referred and not the whole ordinance. The parts are not interdependent. They might have been ordained in separate ordinances. The old law was that a prayer for mandamus was a unit. If the officer could not be commanded in all he could not be commanded in any part. In later times when the petition was to command him to do separate acts and some were required and others were within his discretion, the former only were compelled where the acts sought to be compelled were not tied into each other in such a manner that the commanding of the purely ministerial act would be denying the officer his possessed discretion as to the remaining acts. The writ, I think, is now sufficiently flexible to permit

severable parts to be referred and the others to be withheld. In consequence I think the order should so read.

LARSON, Justice (concurring in part, dissenting in part).

I concur in the order making the alternative writ of mandate and the alternative writ of prohibition in aid thereof permanent. But I think the majority opinion recognizes a rule of practice and procedure which is neither in harmony with the purport of our statutes concerning referendum nor with fundamental democratic ideals, nor with the public weal and welfare. That opinion recognizes or authorizes the practice and the right of any city or town recorder or county clerk to refuse to obey the plain, specific, and positive mandate of the statute just because in his opinion it may at some time in the future result in an abortive or ineffectual thing. To my mind that opinion has the effect of saying that a city recorder may, on a matter which at the time and stage of proceeding is not even branded, marked or colored with a public interest, deny to citizens and voters positive rights expressly granted by statutes just because in his opinion they hope to ultimately try to accomplish something in the community which he (the recorder) thinks that they should not be permitted to do. Or to put it another way, may a city recorder disregard the positive mandate of law and say that citizens may not attempt to ascertain the sentiment of the voters in regard to action taken by the governing body just because they may not be able to change the result of the action so taken? Should the city recorder, or any one else acting through him, prevent the electors of the city from making a public record in a manner provided by law of their opposition, or possible opposition to action taken by the governing body just because it may not be possible to change the result of the action taken? May he say that the citizens shall not be permitted to *petition* for a redress of grievances or even to ascertain if the people are interested enough in the matter to *ask* that they be permitted to be heard?

These matters are all inherent in our democracy. They are basic in representative government. They are fundamental in our constitution, and safeguarded in our statutes. And it seems to me that the prevailing opinion brushes them aside and recognizes in a little appointive office of city recorder dictatorial ideas in plain derogation of the statutes. The laws governing these matters are set forth in Chapter 10 of Title 25, R. S. U. 1933, enacted pursuant to Section 1 of Article 6 of the State Constitution. The procedure therein set up with respect to a referendum is as follows:

(a) An *application* for "petition copies" signed by five qualified electors of the city shall be filed with and certain fees paid to the recorder; (b) The recorder shall then solicit bids from three printers for printing the required petition copies; (c) The recorder notifies the persons who filed the application of the amount of the lowest bid for printing; (d) The amount of such printer's bid must be paid to the recorder by the applicants, called "sponsors," to pay for the printing before any further proceeding or steps are taken by the recorder; (e) If such fees are paid within the time prescribed, the recorder must have the petitions printed and prepared for circulation and deliver them to the sponsors; (f) These petitions may then be circulated by the sponsors for signing. If circulated and signed as required by law, by the required number of qualified signers, and filed with the recorder, they become "Petitions for Referendum." (g) Upon the filing of a proper "petition for referendum" (this includes proper matters of time, form, substance, and signers), the operation of the law to be referred is suspended until after the referendum election. (h) The city attorney then prepares a ballot title for the measure. (i) The recorder submits by proper ballot the measure referred to the voters at the next municipal election, not sooner than ninety days unless the governing body of the city sooner order a special election on the matter.

In the instant case the plaintiffs filed with the defendant as city recorder a proper *application* for "petition copies" of

a proposed referendum petition and paid to the defendant the fees therefor. Defendant accepted the fee, filed the application in his office and a few days later notified the sponsors that he would not solicit bids for the printing. Sponsors then applied to this court for a writ to compel the defendant to proceed in the premises, in performance of his ministerial duties as recorder. The simple question is: Is the duty of the recorder, at the point reached in this instance, to solicit bids for printing, to notify one of the sponsors of the lowest bid, and if such amount be paid into his office by the sponsors, to have the petition copies printed and delivered to the sponsors a *purely ministerial*, a positive mandatory, a mere *clerical* duty or is it one that involves the use of discretion, or of judgment, or an act involved in the management of the affairs of the city so as to be essentially an executive duty? If the former, the writ should be made permanent. If the latter, the alternative writ may be quashed. That the matters here presented fall within the first class or group there can be no doubt and the opinion of my associates so concedes.

A discussion of the use of the writ to compel the performance of a *purely ministerial* or clerical duty is discussed in *White* v. *Welling*, 89 Utah 335, 57 P. 2d 703, and amplified in *Coleman et al.* v. *Bench*, 96 Utah 143, 84 P. 2d 412, to which the reader is referred. The confusion between counsel and what I deem the error in the prevailing opinion results from a consideration of the difference between legislative and administrative matters rather than what is here involved, to wit, the distinctions between *purely ministerial or clerical duties* on the one hand and executive duties on the other hand in the administrative field. That the recorder is in no sense a legislative officer, that he has no duties or functions in the legislative field, and that all his duties fall within the administrative as distinguished from the legislative or judicial fields, will be conceded by all. The recorder here contends that the ordinance in question is not a matter of legislation, is not an act of the city commission in its

legislative capacity, and so subject to a referendum, but is an act of the city commissioners acting as the executive department of the city, and as such their acts are not subject to legislative review, repeal, or referendum by the people acting as one of the repositories of the legislative power of the city. Conceding for the argument, but expressly withholding any ruling upon it, that such contention may be well taken, it cannot avail the defendant in this action. He is as far as this case is concerned no part of the executive power of the city. No such authority is vested in him, and he is vested with no discretion or judgment over the policies or management of the city. He does not determine its policies or control or manage its business or activities. He is an appointed clerical officer whose duties are prescribed by law. By the provisions of Chapter 6 of Title 15, R. S. U. 1933, the Board of Commissioners, Mayor and City Council, and Board of Trustees are respectively made the legislative and governing body in cities of the first, second and third classes, and incorporated towns. By Section 15-6-14 it is provided that in cities of the second class, such as Provo, the executive and administrative powers, authorities and duties, are vested in the commissioners by departments. The duties of the recorder are fixed by Article 2 and Article 3 of said Chapter 6, and provide that he serves under the City Commission in a clerical or purely ministerial capacity as its bookkeeper and auditor. His duties while performed in the administrative field are generally clerical or purely ministerial, and in no sense executive ones. To make clear my position, and without quibbling over or being tied up in terms, the administrative field in government covers or embraces two sets or divisions of activity—those purely ministerial, that is, clerical in nature, and those executive, that is, involved in the management, direction and control of the policy, affairs and business of the city. One officer or employe may have duties purely clerical, one may have duties purely executive, and another may have some duties that are clerical and some duties that are executive. It is the

nature of the particular duty at the time that determines whether mandamus will lie or not. And because in a particular procedure some duties may be executive in character, and so cannot be compelled, does not justify an official in refusing to perform those duties which are clerical in character. Until the proceeding reaches that point in an orderly procedure where the duty of the official is one executive in character, he should be required to perform his duty promptly and without equivocation, stalling or delay. The clerical officer, that is the one whose duty at the time is clerical, should be required to act and perform as a clerk, and not assume to be an executive until an executive duty devolves upon him.

In the instant case the duties of the city recorder are clearly set forth and defined in the statutes. Nothing is left to judgment or discretion. Every step he must take, the time and method of doing it and the result thereof are prescribed. There is no public interest at stake or in any way involved. No restrictions are placed upon the public; no rights of the city limited, curtailed, expanded, construed, acted upon or influenced. No obligation is imposed upon the city; no city money expended; city property used, or city activities affected. The matter is wholly between the sponsors and the incumbent of the city recorder's office. He took their money and then refused to perform his duties for which they paid him. It may be that the printing bids would be so high or because of a change of heart that the sponsors would abandon this idea. It may be that if the petitions were printed and circulated the sponsors could not obtain the requisite number of qualified signers, or they may be signed by 95% of the qualified signers in the city and still they may never be filed, asking for a referendum. Up to this stage neither the city corporation nor the public interest is or can be affected by the proceeding had. What is being done does not affect the management, control, business, enterprises, finances, activities or general police powers or duties of the city. How then can the duty of the

recorder be anything but a purely clerical duty which he must perform without equivocation or delay?

If and when the circulated petitions properly signed and asking for a referendum are presented to the recorder for filing, a somewhat different situation is presented. I opine that if such petition in proper form, properly and sufficiently signed and authenticated, is presented to the recorder, accepted and filed by him, a new duty is imposed upon him to carry out his duties prescribed by statute in submitting the matter to a vote of the people at the next ensuing municipal election more than ninety days after the filing of such petition, unless the city commission order that a special election be sooner held to vote upon the matter. When such referendum petition is filed with the recorder, the public interest and concern are drawn into the picture; the city's activities or policies as determined by the commission are in part interfered with, its proposed activity or policy at least temporarily abated, and the hand of the city officials in regard thereto stayed. If at any time the recorder may be regarded as engaged in executive duties so as to permit him to question the right to a referendum, it would seem clear that such time is when a proper and sufficient petition is presented calling for the referendum, and the acceptance and filing of which by him prevents the ordinance from going into effect, stays the hand of the city officials, and for a time at least abates or holds up the policy which the city, through its commission, would otherwise pursue. As to whether he can raise the question at all we need not now decide. Certainly he may not raise the question when he did here. I concur therefore in the order making the writ permanent. I think costs should be taxed against the defendant personally.

MOFFAT, Chief Justice.

I concur in the result reached in the opinion of Mr. Justice McDONOUGH and in what is said by Mr. Justice LARSON in his opinion concurring in part and dissenting in part.