THE CITY OF BILLINGS, Montana, a body politic and corporate, Plaintiff and Respondent, v. RALPH NORE, et al., Defendants and Appellants.

No. 11038.
Submitted June 9, 1966. Decided August 5, 1966.
417 P.2d 458.

Sandall, Moses & Cavan, Billings, Robert H. Wilson (argued), Hardin, Charles F. Moses (argued), Billings, for appellants.

Cooke, Moulton, Bellingham, Longo & Mather, Billings, Robert P. Ryan, Billings, William H. Bellingham (argued), Billings, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by the defendants-appellants from separate judgments in favor of the plaintiff-respondent on Count No. 1 and Count No. 2 of plaintiff's complaint. Both counts were tried in the District Court of Yellowstone County. Judgment on Count No. 1 was entered on March 15, 1965, and judgment on Count No. 2 was entered on October 26, 1965. By order of this Court dated November 8, 1965, the defendants appellants were permitted to combine the transcript of the record on appeal from the separate judgment, so that the matter could be heard in one appeal.

The plaintiff-respondent is the City of Billings, Montana, and will be referred to as the City. The defendants-appellants, with the exception of the corporate taxpayers' association, all appeared as petitioners for the initiative (which will be explained later); and they are legal electors, owners and taxpayers upon

property within the City of Billings. The defendants-appellants will be referred to as the appellants.

The appellants list ten specifications of error, which we believe raise the following questions.

(1) Whether initiative lies to demand that an ordinance repealing Section 28.80 of Ordinance No. 3082 of the Code of the City of Billings, Montana, 1956 (hereinafter referred to simply as section 28.80) be submitted to the legal electors of the City of Billings for their approval or rejection;

(2) Whether R.C.M.1947, §§ 11-2217 to 11-2221 are constitutional and whether section 28.80 is contrary to the Constitutions of the United States and the State of Montana by virtue of being discriminatory and in violation of due process;

(3) Whether section 28.80 substantially complied with the proposition which had been voted upon by the qualified taxpayer voters of the City; and

(4) Whether it was proven that the storm sewer system will prevent pollution of the sources of water supply or if it is even necessary to prove this prevention of pollution.

This controversy involves the right of the City of Billings to reconstruct and extend its existing storm sewer trunk system. The record before this Court reveals the following facts:

The original storm sewer system was constructed in 1918, and the last major improvement was made in 1938. The existing storm sewer system is not adequate to meet the needs and requirements of the City.

The City Council determined that the storm sewer system needed updating. Thus, on June 2, 1964, the City held a special election of the qualified taxpayer voters of the City to determine whether the City should issue and sell its negotiable revenue bonds in the amount of $4,000,000.00. The proceeds of these bonds are to finance the reconstruction and extension of the municipal storm and sanitary sewer system.

The proposition submitted to the qualified taxpayer voters of the City passed. The City Council, acting pursuant to sections

11-2217 and 11-2219, enacted section 28.80 to provide the City with funds to pay for the costs related to this proposed improvement and the revenue bonds issue.

On December 14, 1964, petitions for initiative were filed with the city clerk demanding that an ordinance repealing section 28.80 be submitted to the legal electors of the city for their approval or rejection. The City Council deemed that section 28.80 was an administrative act and not subject to initiative. Therefore, the City Council did not pass an ordinance on the subject of the ordinance proposed in the petitions for initiative.

It has been stipulated by the parties that not all legal voters of the City, as that term is used in section 11-1104, are qualified electors of the City, as that term is used in section 11-2217. Further, not all persons who are city water consumers and who are being assessed with monthly city storm service charges by the City under section 28.80 are legal voters or qualified electors, as those terms are used in sections 11-1104 and 11-2217.

On January 8, 1965, an action was commenced by the City, alleging generally, in Count No. 1, that the petitions for initiative were invalid and, praying, in Count No. 2 for a declaratory judgment that all proceedings taken by the City for the issuance and sale of the revenue bonds were in all respects legal and valid.

The City Council submitted the proposition, and after its approval by the voters, imposed the charges to finance the proposition under the authority given the council by sections 11-2217 and 11-2219. Section 11-2217 provides in part:

"Any city * * * may when authorized so to do by a majority vote of the qualified electors voting on the question * * * construct * * * and/or extend a storm and/or sanitary sewerage system * * * and may operate and maintain such facilities for public use * * * such municipality shall have authority, by ordinance duly adopted by the governing body to charge just and equitable rates, charges or rentals for the services and benefits directly or indirectly furnished thereby. * * * The sewer charges may be fixed on the basis of water consumption

or any other equitable basis the governing body may deem appropriate and, if the governing body determines that the * * * storm water disposal prevents pollution of sources of water supply, may be established as a surcharge on the water bills of water consumers or on any other equitable basis of measuring the use and benefits of such facilities and services. * * *

"In this act 'qualified electors' shall mean registered electors of the municipality whose names appear upon the last preceding assessment roll for state and county taxes as taxpayers upon property within the municipality."

The ballot which submitted the proposition provided in part:

"For the City of Billings, Montana, issuing and selling its negotiable Revenue Bonds in the amount of Four Million Dollars ($4,000,000.00) * * * in conformity with Revised Codes of Montana 1947, Title 11, Sections 11-2217 to 11-2221 * * * such bonds and the interest thereon to be payable solely out of net income and revenues to be derived from rates and charges for the use of the facilities provided by the undertaking * * *."

The appellants strongly urge that section 28.80 does not follow the mandate of the voters. Hence, we set forth the relevant portions of that section:

"* * * a monthly storm sewer service charge is hereby imposed and made applicable to all premises within the city limits which are connected to the municipal sewerage system for sewage disposal service, or are connected to the municipal water system, or both. * * * Said charge shall be based upon the nature and area of the respective premises connected, in accordance with the table set forth below. A storm sewer charge shall be made for each building and structure having one or more established connections with the municipal sewerage system or water system, based on the area of the parcel of land on which such building or structure is situated. Two or more contiguous lots or tracts of land owned by one person, firm or corporation, or owned in common or joint tenancy by two or

more persons, firms or corporations, shall be regarded as a single parcel of land for this purpose; except that where two or more buildings or structures are situated on the same parcel of land, and have separate water and sewer connections, the area attributable to each building and structure shall be that proportion of the total area of the parcel which the area of such building or structure bears to the total area of all buildings and structures situated on such parcel. Residential charges shall apply to all parcels used exclusively as a permanent dwelling for not more than three families, and to all parks and public buildings. Commercial rates shall apply to all other premises. * * *

| Area | Commercial Charge | Residential Charge |
|------|-------------------|--------------------|
| 7,500 square feet or less | $3.60 | $1.20 |
| 7,501 to 15,000 square feet | 4.50 | 1.50 |
| 15,001 to 22,500 square feet | 5.40 | 1.80 |
| 22,501 to 30,000 square feet | 6.30 | 1.80 |
| 30,001 to 37,500 square feet | 7.20 | 1.80 |
| Over 37,500 square feet | 7.20 plus $.45 per 7,500 square feet thereof in excess of 37,500 square feet | 1.80 |

"* * * Any party who considers the charges applicable to his premises unfair, inequitable or unreasonable may apply to the board of water commissioners for adjustment thereof * * * When the board finds that the charges applicable to any premises are for any reason unfair, inequitable, unreasonable or inadequate, it shall communicate its findings to the city council. The council shall have the right to order a public hearing as to any such matter, and, if convinced that an adjustment of the charges for such premises is necessary to provide equality with those charged to others, it shall so provide, either by ordinance amendatory hereto, or by resolutions fixing special charges for individual premises during the period of contin-

uance of special circumstances which make the standard charges unfair, inequitable, unreasonable or inadequate.''

We have set forth the foregoing portions of section 11-2217, the ballot, and section 28.80 because a thorough understanding of them is necessary for a meaningful understanding of the questions discussed in this case.

This brings us to a consideration of the first question raised. Appellants contend that initiative lies to repeal section 28.80. With this we disagree.

Montana has for many years followed the rule that initiative does not lie concerning matters administrative in nature. See Carlson v. City of Helena, 39 Mont. 82, 102 P. 39; Allen v. City of Butte, 55 Mont. 205, 175 P. 595.

Thus, to answer this question we must address ourselves to the question of whether the City Council performed an administrative or legislative function when it passed section 28.80.

The problem of differentiating between legislative actions and administrative or executive actions is often difficult. Appellants suggest, and we accept, that one reasonable test to be used in making such differentiation is whether the act was one creating a new law (legislative) or executing an already existing law (administrative). See Keigley v. Bench, 97 Utah 69, 89 P.2d 480, 122 A.L.R. 756.

We believe that a careful reading of section 28.80 demonstrates the considerable amount of study and technical knowledge that went into the formulation of the rates. The testimony given at the trial of Count No. 2 substantiates this idea. Briefly, the section accomplishes the following:

(1) It imposes a storm sewer service charge applicable to premises within the City limits;

(2) It provides a sliding scale for the rate;

(3) It specifies how the charge is to be collected;

(4) It establishes that the main factors used in setting the charges are the area and nature (residential or commercial) of the premises connected;

(5) It sets up special rules covering (a) contiguous tracts owned by one person and (b) two or more buildings or structures situated on the same parcel;

(6) It determines what is residential or commercial property; and

(7) It provides a method of reviewing the rates to determine their fairness.

The City Council, pursuant to section 11-2219, had the duty to impose the rates following the affirmative bond issue vote.

Items 2 through 7 above clearly demonstrate that they are merely administrative details necessary to implement Item 1 —the imposed storm sewer service charge. But Item 1 had already been established by the affirmative vote on the proposition. Thus, applying the test suggested by appellants, we find that the City Council was simply executing an already existing law. Therefore, the ordinance was not subject to initiative.

Appellants refer this Court to Keigley v. Bench, supra, as an exact situation to the case at bar. However, in that case, after approval by the voters of an ordinance authorizing a bond issue, a later ordinance changed the financial plan resulting in stretching the payments of principal over twenty years with eighteen annual payments of principal instead of fifteen years with thirteen annual payments. The Utah Court held this to be a legislative act and allowed referendum. To us, this is clearly distinguishable.

In the other case appellants cite, State ex rel. Saylor v. Walt, 66 S.D. 14, 278 N.W. 12, we also find facts entirely dissimilar to those before this Court. There the electors of the City had approved the issuance of bonds for building a city auditorium after which the United States conditionally offered to buy the bonds and give additional financing. The court held that a resolution accepting the offer of the United States was beyond the powers of the City's governing body because it was a wholly different question from the proposal placed before the

voters and further because the statute required a municipality to sell bond issues to the highest bidder after notice.

We come now to the two-fold constitutional question. Appellants have attacked the constitutionality of sections 11-2217 to 11-2221, but their principal attack is leveled at section 11-2217.

We begin a consideration of this issue with a reference to Harrison v. City of Missoula, 146 Mont. 420, 425, 407 P:2d 703, 706, and the rules expressed there:

"Any attack upon the constitutionality of a statute must bear the burden of the presumption of constitutionality. This court has many times held that in determining the constitutionality of any statute that the court will if possible construe the statute as constitutional. The presumption is for constitutionality. No statute will be held unconstitutional unless its violation of the fundamental law is clear and palpable. [Citing previous cases.]"

We summarize the appellants' objections to sections 11-2217 to 11-2221, as follows:

(1) Two classes are not allowed to vote but may be compelled to pay for the project, namely, water and sewer users residing within the city who are not themselves the owners of the property they use, and, therefore, ineligible to vote; and persons living outside the city but using the water and sewer systems;

(2) There are taxpayers who could vote upon such a project but who would not be required to pay for it; and

(3) There has been a violation of the legislature's authority to delegate its powers.

Let us examine the first objection. As a practical matter, when we analyze the limitations placed upon voting, we find that not too many persons are not qualified to vote. Thus, all persons, owning any kind of property whatsoever, be it real or personal, are qualified. Included in this category would be anyone owning household furniture, vehicles,

motorcycles or other personal property of any kind whatsoever. See R.C.M.1947, § 23-311. But appellants in their answer to Count No. 2 admit that they are legal electors and owners of property within the City of Billings. Thus, the appellants are not the proper parties to attack the constitutionality of the statutes on the basis that some persons will have to pay who cannot vote or on the grounds that certain persons outside the City might be charged. In Chovanak v. Matthews, 120 Mont. 520, 526, 188 P.2d 582, 585, we stated:

"As to the various charges of unconstitutionality levelled against Chapter 142 by the appellant, it is elementary that none thereof may be considered unless raised by someone who is directly injured in a legal right by the enforcement of the statute, and then only where determination of the constitutional question is rendered necessary to protect the suitor in such invaded right. [Citing cases.]"

Thus we find no merit in the first objection.

■ In regard to the second objection, we find it difficult to imagine any classification that would be reasonable and that would still accomplish the result which appellants demand; that is, only allow those persons to vote who are eventually going to pay.

■■ Appellants' third objection is likewise without merit. Appellants fail to direct this Court's attention to any portion of the Montana Constitution. Appellants make a general reference to the Montana case of Bacus v. Lake County, 138 Mont. 69, 354 P.2d 1056, but they do not show how that case applies to the case at bar. Finally, we note that in discussing the first question raised by this appeal we showed the considerable amount of administrative detail that was necessary in the fixing of rates for the proposed Billings' storm sewer project. Undoubtedly the same is true for other projects that are authorized by section 11-2217.

We now consider the other phase of the constitutional question. Appellants refer this Court to Section 1 of the Four-

teenth Amendment to the United States Constitution and to Article III, § 27 of the Montana Constitution. Appellants, consistent with their entire attack on the proposed storm sewer project, have utilized a "shotgun approach" in alleging discrimination and denial of due process.

We attempt to briefly summarize the many objections to section 28.80.

(1) It unfairly discriminates against water and sewer users residing within the city limits as against water and sewer users living outside the city limits;

(2) Certain vacant lots are not subject to the assessment;

(3) The rates charged make no allowance for situations where benefit from the storm sewer system is not commensurate with the size of the plot;

(4) Commercial water and sewer users have to pay three times the amount of residential water and sewer users;

(5) The ordinance makes no allowance for differences in the amount of water consumption; and

(6) The proposed project will provide unequal benefits to residents, depending upon where they live in the City.

Testimony given at the trial of Count No. 2 illustrates that most of these objections are ill-founded.

At the trial, the City attempted to explain the five possible methods of assessing rates and to further explain the reasons why four of the methods were rejected and the one chosen. Appellants objected to any testimony relating to the rejected methods. Mr. Edward R. Waldo, a registered professional engineer and general manager of the City of Billings Water Department, testified that the five methods contemplated and studied were:

(1) a charge based upon the number of water connections;

(2) a charge based upon the amount of water consumption;

(3) a charge based upon the assessed evaluation of land;

(4) a charge based upon area alone; and

(5) a charge based upon a combination of area of the property involved and the use to which it is put. Mr. Waldo explained why No. (5) was chosen.

"Q. Now then, Mr. Waldo what method of assessment did you finally decide upon? A. We decided on a method where we took into consideration the area of the property and the usage of the property.

"Q. Now why did you decide upon that particular method? A. We were charged with the responsibility of determining an equitable means of arriving at a charge and as this involved the construction of a storm sewer system we wanted to apportion our cost or the charge that we were going to make in proportion to the utilization of that facility by the property that was going to be served. To do this we differentiated between commercial and residential property. On the average in Billings here the commercial property is more impervious than residential property, that is, you will have more roof area and more sidewalk area and the runoff from the commercial property generally speaking would be greater than the runoff from residential property that has lawns and trees and shrubbery.

The other factors of course would be the actual area of the property itself, and by using a combination of these we felt that we were arriving at the most equitable means of paying for the storm sewer system.

"Q. Now then, going back to the difference between residential and commercial areas, I understand then that you evaluated all areas and designated them either as residential or commercial, is that correct? A. Yes.

"Q. Now, you spoke of the difference in imperviousness between these two areas. Would you explain exactly what you meant? A. If you have a paved area you can expect to have somewhere around 95% of the water that falls on that surface run off, and if you have an agricultural area that has grass or other shubbery why you can anticipate as low as 10% of the water that will actually run off.

"Q. And it is possible that there will be less than 10% run off on a vacant area? A. It's possible, yes.

"Q. Now as far as the average home is concerned, what would be your analysis as to how much would run off? A. We assumed that somewhere around 30 to 35% of the water that actually fell on a residential area in the City of Billings here would be a reasonable figure.

"Q. Now when you say reasonable figure, what do you base this upon? Had there been any engineering studies made of this A. Well, there are engineering reports and basic design information, it's a matter of textbooks and there are certain recommendations there.

"Q. And were these various designs, textbooks and so forth utilized in coming up with the formula that you did? A. Yes, to a degree.

"Q. Also based upon your knowledge of the area out here, is that correct? A. Yes.

"Q. Then I understand you used finally a common factor here of three to one insofar as your residential and commercial areas are concerned. A. Yes.

"Q. And is that, in your opinion, a correct and reasonable factor? A. I would say that it's a reasonable factor.

"Q. Would you say it 100% correct? A. No.

"Q. Mr. Waldo, may I ask you, is it possible to devise a method that would be 100% equitable? A. No."

In later testimony, Mr. Waldo explained why the water department was used as the billing center.

"Q. In making up and sending out assessments to various parties in the city, I understand your department, the water department, was utilized to do this. A. Yes.

"Q. And what was the basic reasons for that? A. The water department was equipped to send out the monthly bills. We are already billing the water charges and it was just a matter of being able to add that to the water bill and we would be able to collect it."

Mr. Waldo also explained further the method of assessment:

"Q. Now so that there is no mistake here as to the method of assessment, I would like to ask you whether or not consumption itself has anything to do with how much a person is assessed? A. No.

"Q. Now calling your attention to vacant areas, vacant lots for example, are any charges levied against the owners or the owners of vacant lots? A. If they have no water connection then we do not make a charge against vacant lots. Where vacant lots are contiguous to commercial property and considered as a single unit, and we serve water to that property then the total area is taken into consideration.

"Q. And why are not vacant lots assessed? A. There would be no reasonable method for us to enforce collection.

"Q. And I think that you have previously testified that vacant lot runoff is relatively minor. A. Normally speaking, that is true.

"Q. Now taking into consideration rental units which are owned by one person and leased from him by another, how is the assessment used there? A. The charge is against the person that is paying the water bill, regardless of whether they own the property or rent the property or don't even have anything to do with it except to pay the bills. Our bill goes to the person that has signed up for the water service.

"Q. In other words, the person who has requested the water service be placed upon the premises. A. Yes.

"Q. Now as far as this storm drainage system is concerned, is it confined entirely within the city limits? A. Yes.

"Q. Does any part of the proposed system extend outside of the City limits? A. There will be some construction outside the city limits.

"Q. What do you mean by that? A. Well, on the map some of the blue lines extend beyond the city limits, but it is necessary to have that in order to get the storm water to the river.

"Q. In other words, you are referring to the blue line that you have designated at the bottom of the chart with a 'C', I assume, is that correct? A. Yes.

"Q. But as far as people living outside of the city, no part of the storm drainage system, I understand was designed for their use. A. That is correct.

"Q. Now does the city furnish water to people living outside the city limits? A. Yes.

"Q. Are those people who live outside the city limits and to whom water is furnished by the city, being assessed for any part of the storm drainage system upon the method that you have previously testified to? A. They are not assessed for the storm charges.

"Q. In other words, I understand that only people living in the city limits are being assessed. A.Yes."

The testimony clearly demonstrates that appellant's first objection is groundless since the storm sewer system is designed to serve the City of Billings only.

Certain vacant areas are not assessed because the run-off is minimal and because the enforcement of the charges would be impractical.

Section 28.80 spells out very carefully the fact that dissatisfied parties can have a review of the charges established. The third objection of the appellants simply ignores this provision.

In regard to the fourth objection, the testimony quoted clearly reveals the reasons for the difference in the charges. Appellants offered no testimony to rebut this seemingly reasonable approach. Appellant's bare assertion now that commercial property does not receive more benefit is without merit.

Appellants' fifth objection is irrelevant since the method of assessment is not in any way dependent upon the amount of water consumed.

Appellants in their last objection contend that there will be unequal benefits from the use of the facilities. Part

of appellants' argument proceeds upon the basis that residents of the city presently connected to the existing storm sewers are paying for future expansion even though they will not benefit from it. This argument is clearly erroneous. Section 11-2217 refers to the services and benefits not only directly furnished but indirectly furnished as well.

The record shows the following reasons for the proposed improvements—the present storm sewer system has been overloaded causing surcharging of water back into homes and business properties; excess water is collecting in the streets and other places causing excessive maintenance expenses and danger to the health and welfare of city residents; and the present sanitary sewer system is receiving excessive infiltration of water which would be stopped by a proper storm sewer system. Furthermore, if the proposed improvements are made, the cost of street repairs necessitated by the poor drainage will be minimized, the construction of permanent-type pavements will be encouraged, the flow of vehicular traffic will be protected and improved, safety and health standards will be enhanced, and unsightly and unsanitary conditions will be removed.

When we examine the foregoing reasons, it becomes apparent at once that not only are residents within the proposed sewer extension system to be benefited by its adoption, but also residents living within the present storm sewer system will be benefitted. The present storm sewer system is not adequate and modifications need to be made; the existing trunk sewer system will be extended; the old one will be improved, not only from a reconstruction of the old system in places, but also indirectly as well from the fact that the present overloading will be relieved by the proposed construction. The foregoing is a benefit to the people presently being served by the old system.

Appellants had to show a clear and palpable violation of the fundamental law. Appellants had to overcome the presumption of the constitutionality of the statutes and the section. They have failed to meet these requirements.

We hold that sections 11-2217 to 11-2221 and section 28.80 are constitutional.

The third question presented by this appeal is the heart of the appellants' objection to the entire project. It has been mentioned before, and it is repeated often in appellants' brief. Appellants contend that the mandate of the voters approved a plan whereby the addition to the present storm sewer system would be financed out of the net income and revenues derived from the use of the facilities. As we view the matter, this is exactly what the City Council did when it enacted section 28.80. However, the appellants have misconstrued the true effect of section 28.80 and contend that it imposes a charge for simply being connected to the municipal sewerage system of the municipal water system. But this is not so. The testimony quoted clearly establishes that the charges imposed by section 28.80 are not in any manner connected to the amount of water consumed. The charges are imposed and determined according to the nature and area of the real property which will be served by the storm sewer system, in other words, for the use of the facilities. It was necessary for the city council to have some method of billing the thousands of people who would be using the new storm sewer system and who would be paying for this use. The charge is based upon the use of the facilities. The water bill is only the vehicle to get this charge to the public user.

Appellant's misconstruction of section 28.80 raises the last question. Appellants' brief states that "Section 11-2217, R.C.M.1947, provides that the assessment may be established as a surcharge on the water bills of water consumers only 'if the governing body determines that the sewage treatment and/or storm water disposal prevents pollution of sources of water supply.' "

However, section 11-2219 provides in part: "The governing body of such municipality shall have full power and authority, and it is hereby made its duty to fix and establish, on the basis

of water consumed or any other equitable basis, by ordinance or resolution, and collect rates and charges for the services and facilities afforded by the system * * *." There is no condition of any kind, pollution or otherwise, attached to the collection of such rates and charges under this statute. This is authority alone for the City's action in the present case. This section is specific in its purpose, dealing directly with the rates and charges.

The language of section 11-2217, on the other hand, is broad, but a reasonable interpretation of this language does not require a finding of prevention of pollution before rates and charges can be assessed to pay for the system.

Finally, section 11-2217 only requires that the municipality *determine* that the system will prevent pollution of the water supply. The record shows at least one specific example in which the proposed storm sewer system will prevent pollution of the water supply. Appellants offered no testimony to rebut the determination by the City that the system will prevent pollution.

Section 28.80 has substantially compiled with the proposition approved by the qualified taxpayer voters of the City. In addition, it substantially complies with sections 11-2217 to 11-2221. We reject completely appellants' contention that there has been no compliance. We have examined the cases from other jurisdictions which the appellants have cited. In each of these cases there was a definite deviation from the approved proposition and the final action by the municipal government.

Appellants refer us to no Montana cases which require strict compliance with statutory provisions in situations such as the case at bar. There is dicta in several Montana cases to the effect that substantial compliance is all that is required. See Evans v. City of Helena, 60 Mont. 577, 199 P. 445; Weber v. City of Helena, 89 Mont. 109, 297 P. 455.

Having determined that section 28.80 substantially complies with the issue voted upon by the qualified taxpayer voters of

the City of Billings, it follows, we feel, that the City Council's passage of section 28.80 of ordinance No. 3082 was administrative in nature, and, thus, initiative would not lie. The City Council then was justified, as the trial court found, in rejecting the initiative effort.

We have carefully considered every other specification of error alleged by the appellants and deem them without merit.

Finding no error, we affirm the judgments appealed from.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN CONWAY HARRISON, DOYLE, and ADAIR, concur.