WHITE et al. v. WELLING, Secretary of State.

No. 5808.   Decided May 5, 1936.   (57 P. [2d] 703.)

Rehearing Denied October 14, 1936.

*Rendell N. Mabey,* of Salt Lake City, for plaintiffs.

*Joseph Chez,* Atty. Gen., and *S. D. Huffaker,* Deputy Atty. Gen., for defendant.

PER CURIAM.

This is an application for an alternative writ of mandamus to compel the secretary of state to do certain acts provided for in title 25, chapter 10, R. S. Utah 1933, known as the Initiative and Referendum Law. An alternative writ was issued directing the secretary of state to perform said acts or show cause why he refused to do so.

Title 25, chapter 10, above referred to, dealing with the initiation of legislation on behalf of the people independent of the Legislature and for the referendum to the people of certain laws passed by the Legislature, provides for three stages respecting the initiation and submission of laws to the people directly. The first stage provides for an application for "petition copies" to be filed in the office of the secretary of state, which application shall be signed by not fewer than five persons designated as "sponsors." There are certain qualifications which these sponsors must possess. The second and third stages of procedure under the law do not concern us in this proceeding. The second deals with the circulation of the petition and the actual initiation of the law by the obtaining of the signatures of 10 per cent of the electors of the state and at least 10 per cent of the electors in every county of a majority of the counties. This constitutes the actual initiation. The third stage is the printing of a synopsis of the properly initiated law on the ballots and the voting of the people thereon.

Reverting again to the first stage of the procedure, upon the payment of the $10 fee for, and the filing of, the application for petition copies, the secretary of state shall determine from such application the number of petition sections desired and the number of circulation sheets required for each section; the circulation sheet, as specified by the act, to be a sheet ruled with 25 lines to the page, three-eighths of an inch apart, with a specified space left at the top for the purpose of binding and for the printing of a warning as to the penalty for violation of the law under such space and before the beginning of the lines. Each line is for a signature of an elector with a space for his address. On the back of each circulation sheet is printed a form for the certificate of a notary public or other person permitted to administer oaths, to the effect that the names of the persons which appear on the front side of the sheet were signed by persons who professed to be the persons whose names appear thereon, and that he believes each signer is a voter of

the state of Utah, and that each had signed his name and written his post office address correctly. Under the law, when the application for petition copies is filed, it is the duty of the secretary of state to ascertain from said application how many of these circulation sheets are to go in each petition section, and, if he cannot ascertain that from the application, he is then to call upon the sponsors as to how they desire to have the petition sections made up and the number of petition sections desired. The purpose of this is that those who circulate the petitions for signatures of electors may take various sections of the proposed petition into different parts of the state and obtain signatures simultaneously, but that each section will have a definite number of circulation sheets of a uniform size and type so that, when the different sections of the petition are assembled, they will form one uniform whole which may be evenly bound and repose in the office of the secretary of state. The law requires that the front of each section have a printed copy of the law which it is proposed to initiate, so that the electors who are requested to sign that particular section may have opportunity to read the proposed law. Provision is made in the law for the different sections signed by electors in the various counties to be sent to the county clerk of each such respective county for the purpose of determining whether the signers were qualified electors. The sections would remain unassembled until they were finally returned by the various county clerks to the secretary of state. The purpose of applying to the secretary of state for the printing of circulation sheets and petition copies is in order that the uniform sections containing the circulation sheets should start from a central office, and that, after the circulation sheets are filled with signatures, they may be reassembled in such central office, thus making for uniformity in the type of petition circulated and the parts thereof and orderliness, expedition, and accuracy in the performance of the various steps required to be taken within the certain specified periods before the election. There is a timetable pro-

vided in the law within which every step is required to be done, leading right up to the time of the printing of the ballot.

The act further provides that, after the secretary of state ascertains the number of sections and the number of circulation sheets for each section, which would apprise him of the total number of circulation sheets needed and the total number of copies of the law needed to append one to the front of each petition section, he shall, within three days, call for bids from three different printers and shall transmit the lowest and best bid to the sponsors, who shall thereupon, within a certain length of time after receiving such information, pay to the secretary of state the cost of said printing. The law also provides for a charge of 50 cents for each 100 circulation sheets, which also is to be paid by the sponsors. Thus the state is not put to any expense in the printing or making up of the petition sections which are to go before the electors for signatures in order to initiate the law.

It appears from the record in this case that four different applications for petition copies were presented to the secretary of state; each application signed by five sponsors. No point is made that the sponsors did not have the qualifications required for sponsors by the act. Appended to each application for petition copies was a copy of the proposed law to be initiated under that particular application. In other words, it was intended that four different purported proposed laws should be initiated; therefore an application for petition copies for the initiation of each proposed law was filed and the $10 fee paid for and five sponsors appeared as signers of each application. The secretary of state received the applications and received the fee in each case, but it is claimed by plaintiffs in this mandamus action that the secretary of state has refused to proceed to determine from the applications how many sections he should make up and the number of circulation sheets required for each section, or that if he was unable to do so from the content of the application for the said petition copies, he refused to make

known his inability to the sponsors as provided by the law. The petition for the writ of mandamus was brought by four plaintiffs, each one of whom appeared as one of the sponsors on each of the four separate applications for petition copies. The petition for the writ of mandamus was to require the secretary of state to act on all four applications on the theory that his failure to act on all of them was a refusal to do a particular ministerial duty, to wit, act as required by the law pursuant to the applications for petition copies. The Attorney General, representing the secretary of state, has demurred generally and specially. The petition for such writ has attached to it copies of each of the applications for petition copies and each of the purported proposed laws to be initiated.

We believe the following principles are applicable in regard to the duty of the secretary of state under the first or preliminary stage of procedure dealing with the matter of the application for petition copies as provided by title 25, chapter 10, R. S. 1933:   (1) The secretary of state cannot pass upon the constitutionality of any proposed law, at least at this stage of the proceedings under the Initiative and Referendum Act. *Threadgill* v. *Cross*, 26 Okl. 403; 109 P. 558, 138 Am. St. Rep. 964; *In re Initiative Petition No. 2*, 26 Okl. 548, 109 P. 823; *In re Initiative State Question No. 10*, 26 Okl. 554, 110 P. 647; *State* v. *Osborn*, 16 Ariz. 247, 143 P. 117; *State* v. *Kozer*, 126 Or. 641, 270 P. 513.   If the proposed law showed unquestionably and palpably on its face that it was unconstitutional—for instance, an attempt by the proposed law to abolish a constitutional office, board, or department—it is quite likely that this court would refuse to issue the mandamus on the theory that it would not compel the secretary of state to do something which would in the end be unavailing. *State* v. *Roach*, 230 Mo. 408, 130 S. W. 689, 139 Am. St. Rep. 639; *State ex rel. Cranfill* v. *Smith*, 330 Mo. 252, 48 S. W. (2d) 891, 81 A. L. R. 1066; *State ex rel. Davies* v. *White*, 36 Nev. 334, 136 P. 110, 50 L. R. A. (N. S.) 195. (2) The secretary of state cannot,

nor can this court in a mandamus proceeding, pass upon a question of merit, worth, wisdom, validity, or policy of any proposed law intended to be initiated. *State* v. *Kozer,* supra. (3) The acts required to be done by the secretary of state, at least under this stage of the procedure provided by the law, are ministerial, and he has no discretion, except in so far as to determine whether the document or instrument submitted and purporting to contain the proposed law to be initiated has the semblance of a law, or is such a matter as is not properly the subject of the Initiative and Referendum Act. That is to say, the secretary of state would not be required, for instance, to submit to the people (a) something merely calling for their opinion or other belief; or (b) something which, if voted on favorably by the people, would not have any of the characteristics or attributes of a law; or (c) something which is so unintelligible, incomprehensible, incoherent, or meaningless that it will not permit of a determination as to whether or not, if passed, it would be a law; or (d) some matter which was not contemplated by the Initiative and Referendum Act, such as a proposed amendment to the Constitution. See *Hodges* v. *Dawdy,* 104 Ark. 583, 149 S. W. 656; *Brazell* v. *Zeigler,* 26 Okl. 826, 110 P. 1052.

As illustrations: Under (a) above, there could not be submitted to the people the question as to whether they liked or disliked a certain poem, or whether or not they believed in prohibition. Under (b) above, there could not be submitted to the people something with a content which had none of the characteristics of a law; that is, something which did not lay down a regulation or a rule of conduct, or did not impose a duty or confer a right or prohibit some acts or conduct, or which did not affect, change, or create a status or relationship, or which did not repeal or amend an already existing law. Thus, if a document with an enactment clause, "Be It Enacted By the People of The State of Utah," followed by Lincoln's Gettysburg Address, was proposed, it would, even if it received the requisite number of yeses on election day, not be a law. The secretary of state would not

be required to proceed in such case because he at least has the discretion to determine whether it has the semblance of a law. Furthermore, under (c) above, if there was submitted to him a document which was so unintelligible or incomprehensible that its meaning could not be determined, the secretary would not have to proceed; that is to say, if it was so meaningless or so unintelligible and confused that, even though it received the required number of "yeses," the courts could not give it meaning, the secretary would not have to proceed. In Gulliver's Travels is narrated the incident where type was thrown into a certain machine and came out with certain combinations which were made to constitute words. These combinations of letters were again thrown into the machine, and the combinations which they made, upon being ejected from the machine, were supposed to be phrases, clauses, and sentences. And these again were mixed up, and, as they came out, constituted pages of a book. This extreme illustration would hardly have the attributes or characteristics of a law, and would probably come under (c) above. But a case may be conceived where there were real words and even an intended order and meaning in the use of words put in the form of clauses and sentences, but the words so chosen so contradictory and confusing as to defy all interpretation, so that no one could say that there was definiteness of meaning sufficient to interpret or determine the meaning of the document.

The case where the language of the proposed law is so ambiguous, incoherent, or unintelligible as to make interpretation impossible is analogous to the case where a complaint or information is so unintelligible as not to inform a court of what it was intended to take jurisdiction of. In such case the court does not obtain jurisdiction because it cannot know of what subject matter it is asked to take jurisdiction of. We said in *Atwood* v. *Cox,* 55 P. (2d) 377 at page 381:

"However, where jurisdictional facts are required to be alleged in the pleading and are not alleged, or *where the complaint or information is so scanty in its facts or so ambiguous or incomprehensible as to make it impossible to ascertain whether the jurisdiction of the court*

*has been invoked* \* \* \* then the court has no jurisdiction to go any further than to decide to refuse to take cognizance."

In view of the above principles laid down, we shall consider the general demurrer in the light of the four proposed laws attached to the applications for petition copies. The first is designated, "People's Petition No. 1," and entitled, "The 'Certain Inalienable Rights' Act Regulating Taxes," consisting of nine legal sized sheets of comparatively fine print together with a number of forms for making of reports. It would be impossible to consider every section and subsection contained in this document. It contains eighty sections and a great many subsections. Section 2, subsec. a, purportedly providing for the basis of valuation for all taxes, and therefore the very foundation of the proposed law, reads as follows:

"a. The assessment valuation basis of all taxes, for support of government and schools as provided in this act, shall be the annual profit as determined by assessment of all production and/or income derived from sources reposing or exercised in Utah. The said sources shall be liable for the taxes in all cases of delinquency and the tax shall be a lien upon all such sources, except the homes lived in by any owners and of a value up to the constitutional exemption amounts, and all property of disabled war veterans, their widows and other dependents to a value of $3,000."

It appears to us that this is unintelligible. It speaks of the assessed valuation basis for all taxes being the annual profit, but says the annual profit shall be determined by assessment of all production and/or income derived from sources reposing or exercised in Utah. Here is a juxtaposition of two or three unrelated incongruous ideas. How can an annual profit be determined by assessment of all production and income? There may be no profit whatsoever in production. How can it be determined by an assessment of all production or income? There may be production without income. And which is it? Assessment of all production and income, or all production or income? If it is assessment of all production and income, it would mean that the produc-

tion would be assessed and the income from the production also assessed. But, if it is production or income, then it would be one or the other. The next sentence states that "The said sources shall be liable for all taxes in cases of delinquency." Does this mean only in cases of delinquency? If so, what are the taxes imposed in order to determine that a tax is delinquent?

Section after section presents the same or greater difficulties of interpretation. The wording to express ideas is so chosen as to make it impossible for an intelligent mind to determine what idea or combination of ideas it was meant to convey. After all, language is the medium for the conveying of ideas. There are many ways, perhaps, of conveying a thought, but, if the combination of words used is such that it either conveys no thought, or is so unintelligible or confused that no intelligent mind can determine what thought it did purport to convey, then it is meaningless. An examination of this proposed law under "People's Petition No. 1" seems to place it under the principle in (3) (c) above enunciated.

When we get to people's petition No. 2, which is headed, "The Compensated Legislative Procedure Reform Act," we find it purports to place before the people ■ an amendment to the Constitution of Utah by changing the per diem pay of members of the Legislature from $4 to $10 a day. Section 1 reads:

"Amend and apply the Section 9 of Article VI, of the Constitution of the state of Utah as follows."

The sentence itself does not seem to be complete. It continues:

"9. The members of the legislature shall receive such per diem and mileage as the Legislature may provide, not exceeding (    ) ten dollars per day, and ten cents per mile for the distance necessarily traveled going to and returning from the place of meeting on the most usual route, and they shall receive no other pay or perquisite."

Then follows material purporting to change the Constitution of Utah so as to make the regular session of the Legis-

lature consist of twenty monthly meetings with three days of legislative work in each of twenty consecutive months. It is provided that each house shall announce and hold a public hearing to be conducted by and limited to citizen voters in the county and district, such hearings to be had in the presence of a member of the Legislature. At these hearings the citizen voters shall choose their own officers and method of procedure and take a vote on each proposed measure after discussing it among themselves.

There is no provision in the Constitution of Utah for submitting to the people an amendment to the Constitution through the initiative and referendum laws or by the initiative method. The Constitution of Utah can be amended only in the way provided by article 23, §§ 1 and 2. This proposed constitutional amendment cannot be submitted. It cannot be initiated in this form. Consequently, the secretary of state was not required to proceed under the application containing people's petition No. 2.

The application for petition copies for people's petition No. 3 shows a proposed resolution. It is prefaced by seven sections each beginning with "Whereas" and covering three legal sized pages of fine print and containing statements, narratives, and arguments, but no mandatory provisions. The resolution part reads as follows:

"Wherefore, be it resolved by the People of the State of Utah, in general election on this 3rd day of November, 1936, A. D., to petition and request each state of this Union and the United States government at Washington, D. C., to ask all nations and their people that each consider and cooperate to create world peace with a united tax system that will organize the people of each state and nation so that they all may properly support their governments and at all times be ready to resist every form of tyranny or aggression."

Section 8 provides that the secretary of state shall send copies of the resolution together with copies of people's petitions Nos. 1, 2, and 4 "to each state and to the nation." This comes under the designation of (3) (a), (b), and (c) above. It would not be a law if it received the required num-

ber of "yeses" at the election. No provision is made in the Initiative and Referendum Act for resolutions by the people.

The application for petition copies for people's petition No. 4 encompasses a proposed law headed, "The People's Act Regulating Political Parties." Even a very casual reading of the eight sections covering a legal sized sheet and a half of fine print reveals that the plan is so incomplete, indefinite, and ambiguous as not to be operative. We do not intend to say in this opinion that, if a proposed law is indefinite or ambiguous in part, the secretary can refuse to proceed. He cannot refuse because he cannot understand a part of the proposed law; but, when the proposed purported law is, as a whole, so incomplete, ambiguous, incomprehensible, or so drawn that it would be completely unworkable or inoperative and its meaning a mere guess, so that, were it to pass, no court, officer, or any other person could make it make sense, it would not then be a law. A combination or an assemblage of words, which are so put together as not to make sense or understanding or so indefinite or lacking in meaning that there would be nothing tangible to enforce, is not a law nor the semblance of a law. They are utterances without legal meaning.

We cannot compel the secretary of state to proceed with matter which by its nature never could become a law because not sufficiently definite or meaningful to be such. Where a purported contract is so indefinite or unintelligible or ambiguous as to make it impossible to tell on what the minds intended to meet, it is no contract. The same is true of something which may be submitted as a proposed law and passed. Reading matter has been passed, but no law. The matters submitted with the applications for petition copies reveal sincere and public spirited efforts on the part of their author to effect some fundamental reforms. Whether they are good or bad, wise or foolish, it is not our province to say. The tragedy is that the really great effort and time consumed in drafting these matters have been fruitless because the author lacked the background and training to put his ideas in such phraseology as to make them understandable or

comprehensible. It is as if a layman without the knowledge of the meaning of medical terms were to try to write a treatise on medicine. Legal rights, duties, and relationships as expressed in language must be sufficiently definite, complete, and understandable so that they may be translated into realities. This the so-called proposed laws do not do.

The alternative writ of mandamus heretofore issued is recalled, and the application for the permanent writ of mandate is denied; each party to pay his own costs.