Clifford E. WARREN, Appellant,

v.

H. A. (Red) BOUCHER and State of Alaska,
Appellees.

No. 2315.

Supreme Court of Alaska.

Nov. 28, 1975.

Clifford E. Warren, pro se.

Timothy G. Middleton, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

## OPINION

Before RABINOWITZ, C. J., and CON-NOR, ERWIN, BOOCHEVER and BURKE, JJ.

CONNOR, Justice.

This case raises issues regarding the initiative procedure in Alaska. Specifically, it is concerned with the process and conditions, if any, by which enactments of the legislature can operate to prevent an initiative from appearing on the ballot.

### I.

The procedural history antedating this appeal is undisputed. Prior to the regular 1974 session of the Alaska legislature, an initiative petition entitled "An Act relating to campaign contributions, expenditures, and their limitations" was filed with the lieutenant governor. During that session, the legislature enacted Ch. 76, SLA 1974. That act is entitled, "An Act relating to the election campaigns; and providing for an effective date."

Pursuant to AS 15.45.210,[1] the lieutenant governor, H. A. (Red) Boucher, sought to determine whether the act and the initiative were substantially the same. An opinion of the attorney general, Norman C. Gorsuch, was sent to the lieutenant governor in a letter dated June 17, 1974. The attorney general's opinion was that the measures were substantially the same and, therefore, the initiative was void. The lieutenant governor concurred and notified the initiative committee that the initiative would not appear on the ballot.

This case was initiated on June 25, 1974, when Clifford E. Warren filed a "Complaint for Declaratory Judgment" in the superior court. Warren sought a preliminary injunction requiring the lieutenant

governor to place the initiative on the primary ballot of August 27, 1974, or, alternatively, on the general election ballot.

Oral argument was heard on June 28, 1974, and the preliminary injunction was denied.

On July 16, 1974, Warren brought a petition for review to this court. The petition was initially denied, but on motion for reconsideration review was granted and, on August 20, 1974, we remanded the case to the superior court with directions to proceed to a final determination of the action as expeditiously as possible.

On September 6, 1974, Judge Carlson granted summary judgment for defendants in a memorandum decision. From that judgment this appeal has been taken.

### II.

Warren offers two significant arguments in contending that the initiative should be placed before the voters. He asserts that:

(1) AS 15.45.210[2] is unconstitutional because the legislature has improperly delegated a judicial function to an executive officer;

(2) Ch. 76, SLA 1974 and the initiative are not substantially similar;

Several additional arguments are offered by appellant, though not all of them warrant extended analysis.

### III.

Appellant strongly urges that AS 15.45.-210 improperly delegates to the lieutenant governor the duty of determining, in the first instance, whether an act and an initiative are "substantially the same." He argues that this law violates the separation of powers doctrine by vesting the construction of constitutional language in an executive officer of the state, rather than in

---

1. AS 15.45.210 provides:
    "If the lieutenant governor, with the formal concurrence of the attorney general, determines that an act of the legislature that is substantially the same as the proposed law was enacted after the petition

had been filed, and before the date of the election, the petition is void and the lieutenant governor shall so notify the committee."

2. *Id.*

the courts.[3] The statute, enacted in 1960, provides:

"*Determination of void petition.* If the lieutenant governor, with the formal concurrence of the attorney general, determines that an act of the legislature that is substantially the same as the proposed law was enacted after the petition had been filed, and before the date of the election, the petition is void and the lieutenant governor shall so notify the committee."

Obviously, the statute was enacted to effectuate Art. XI, Sec. 4, of the Alaska Constitution. That provision states:

"*Initiative Election.* An initiative petition may be filed at any time. The lieutenant governor shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing. If, before the election, substantially the same measure has been enacted, the petition is void."

■ At the outset, we note that Art. XI, Sec. 4, does not expressly confer on any branch or agency the power to determine whether an act and an initiative are "substantially the same." However, Alaska Constitution, Art. V, Sec. 3, declares in part:

"The procedure for determining election contests, with right of appeal to the courts, shall be prescribed by law."

Alaska Constitution, Art. XII, Sec. 11, provides, in part:

"As used in this constitution, the terms 'by law' and 'by the legislature,' or variations of these terms, are used interchangeably when related to law-making powers."

We conclude that these constitutional provisions, when read in harmony, give the legislature the power to enact a method of determining whether two provisions are "substantially the same," as used in Art. XI, Sec. 4, of the Alaska Constitution.

■ The legislature has expressly delegated its power in this regard to the lieutenant governor,[4] subject to review by the courts.[5] In reviewing that delegation of power, we reiterate that we are disinclined to pass judgment on the means selected by the legislature to accomplish legitimate purposes, unless such means clearly violate the Constitution. *DeArmond v. Alaska State Development Corp.*, 376 P.2d 717, 724 (Alaska 1962).

Courts in modern times have been reluctant to declare legislation unconstitutional on the ground of improper delegation of power.[6] Indeed, Professor Louis L. Jaffe, in commenting on the United States Supreme Court's attitude toward such challenges, has noted:

"The Court has given the Congress a latitude broad enough for almost any administrative experiment presently believed necessary."[7]

---

3. Warren also contends that AS 15.45.210 violates Alaska Constitution, Art. III, Sec. 22.
"All executive and administrative offices, departments, and agencies of the state government and their respective functions, powers, and duties shall be allocated by law among and within not more than twenty principal departments, so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may be established by law and need not be allocated within a principal department."

4. *See* AS 15.45.210, n. 1, *supra.*

5. AS 15.45.240 provides:
"Any person aggrieved by a determination made by the lieutenant governor may bring an action to have the determination reviewed within 30 days of the date on which notice of the determination was given by any appropriate remedy in the superior court."

6. *See generally,* Jaffe, *An Essay on the Delegation of Legislative Power,* 47 Colum.L.Rev. 359 and 561 (1947).

7. *Id.* at 581.

And Professor Kenneth C. Davis has stated:

"We have learned that the danger of tyranny or injustice lurks in unchecked power, not in blended power."[8]

This does not mean that the legislature has an unlimited right to delegate its responsibilities. But where it would be impractical or cumbersome for the legislature to undertake the task in question, a limited delegation, subject to appropriate review, has been upheld.[9]

Turning to the case at bar, the legislature has divested itself of a fact finding task which has no direct relation to that body's law making functions. Comparative analysis of varying pieces of legislation can be an arduous and time consuming endeavor. We find that the delegation in this case is based on sound, practical considerations.

In delegating the responsibility to the lieutenant governor,[10] the legislature has assigned the task to the person who is in charge of administering and supervising the conduct of all state elections.[11] In addition, the lieutenant governor performs extensive ministerial functions related to the initiative process.[12] Thus, the legislature has delegated its authority to a logical governmental officer.

The delegated function, in this instance, is definitionally narrow. The lieutenant governor, aided by the attorney general, must make a simple factual determination: Are two documents substantially the same in their content? In carrying out this determination, the lieutenant governor is not formulating policy. The framers of the Alaska Constitution have already decided that an initiative is void if legislation, which is substantially the same, exists. By determining whether two documents are substantially the same, the lieutenant governor is simply effectuating constitutional policy.

Similar non-discretionary delegations have been upheld in other jurisdictions.[13] The Alaska legislature has expressly afforded an aggrieved party the right to judicial review.[14] In these circumstances, we hold the delegation of power in AS 15.45.-210 to be both reasonable and constitutional.

IV.

Warren also urges that the superior court erred in ruling that the initiative and the act are "substantially the same."

In his memorandum decision of September 6, 1974, the trial judge undertook to define the phrase "substantially the same," as used in Article XI, Sec. 4, of the Alaska Constitution. He concluded that the phrase is broad enough to include a statute which "treats the same problem as that sought to be reached by the proposed initiative." He then granted summary judgment for the state because he found that

8. K. Davis, *Administrative Law Text* § 1.08, at 25 (1972).

9. *See, e. g., Union Bridge Co. v. United States*, 204 U.S. 364, 387, 27 S.Ct. 367, 51 L.Ed. 523 (1907) ; *Meadowlark Farms, Inc. v. Ill. Pollution Control Bd.*, 17 Ill.App.3d 851, 308 N.E. 2d 829, 832 (1974) ; *Leininger v. Alger*, 316 Mich. 644, 26 N.W.2d 348, 352 (1948).

10. The delegation initially went to the secretary of state, but that office was supplanted by the creation of the lieutenant governor's post in 1970.

11. *See* AS 15.15.010 *et seq.*

12. *See* AS 15.45.010 *et seq.*

13. *See, e. g., Adams v. Bolin*, 74 Ariz. 269, 247 P.2d 617, 627–28 (1952) ; *Hodges v.*

*Dawdy*, 104 Ark. 583, 149 S.W. 656, 658–59 (Ark.1912) ; *Leininger v. Alger*, 316 Mich. 644, 26 N.W.2d 348, 352 (1948) ; *Schmidt v. Gronna*, 68 N.D. 488, 281 N.W. 57, 60 (1938) ; *Brazell v. Ziegler*, 26 Okl. 826, 110 P. 1052 (1910) ; *White v. Welling*, 89 Utah 335, 57 P.2d 703, 705 (1936).
   *Cf. Union Bridge Co. v. United States*, 204 U.S. 364, 385–86, 27 S.Ct. 367, 51 L.Ed. 523 (1907) ; *Meadow Lark Farms, Inc. v. Illinois Pollution Control Bd.*, 17 Ill.App.3d 851, 308 N.E.2d 829, 832 (Ill.App.1974) ; *Joseph E. Seagrams & Sons, Inc. v. Hostetter*, 45 Misc.2d 956, 258 N.Y.S.2d 442, 451 (Sup. Ct.1965).

14. *See* n. 5, *supra*.

the statute and the initiative "attempt to reach the same results, more effective election campaigns."

In reaching his definition, the trial judge relied, in part, on commentary which accompanied the Constitutional Convention Committee's Proposal No. 3, concerning initiatives and referendums. That proposal, in pertinent part, stated:

> " . . . Laws proposed by the initiative shall be submitted to the voters by ballot title at an election not later than 180 days after the adjournment of the legislative session following the filing of the petition, *unless the legislature enacts the measure initiated during the session.* . . ." (emphasis added)

The commentary, which did not refer to any specific phrase within Proposal No. 3, stated:

> "If the legislature adopts a measure that is the subject of the initiative, the measure does not have to be submitted to the people."

Subsequent to the introduction of Proposal No. 3, several amendments to it were made. Article XI, Sec. 4, now reads:

> "An initiative petition may be filed at any time. The lieutenant governor shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing. *If, before the election, substantially the same measure has been enacted, the petition is void.*" (emphasis added)

In view of the changes which this provision underwent after its introduction, we find the committee commentary which guided the trial court to be less than conclusive. As we stated in *Walters v. Cease,* 388 P.2d 263, 266 (Alaska 1964):

> "While such a statement might have been a valuable aid for ascertaining the

intention of the convention with respect to the constitutional provision then under consideration, it loses any value it may have had because Proposal No. 3 . . . was later amended so as to materially change its meaning." (footnotes omitted)

The committee proposal was first taken up by the constitutional convention as a committee of the whole. Later the proposed article was considered a number of times through floor discussions of some length, and numerous amendments were adopted. However, there is no helpful discussion of what was the intended scope of the words "substantially the same measure." Thus the ultimate construction of this critical language devolves upon this court.

■ Our dissenting colleagues rightly observe that the article on direct legislation was the subject of extensive debate at the constitutional convention. They read the term "substantially the same measure" as permitting legislative displacement of an initiative only within rather narrow confines. However, we find nothing in the legislative history of the article, or in the vigorous floor debates thereon, which points to an agreed upon meaning or a consciously adopted definition of what this critical language should mean. Many views were expressed by individual delegates, but these expressions do not in this instance provide a reliable guide to what the constitutional convention as a whole intended by the adoption of the phrase in question, or what it meant to the voters who ratified the constitution. In order to interpret this language we must analyze its functional relationship to other constitutional provisions. We must infer the purposes and intentions of the framers from the language of the constitution itself, with careful regard for the apparent aims which the framers had in mind.[15]

15. The dissent refers to the frustrations experienced by Alaskans under territorial government, and the deeply felt need for self-government which led to convening the con-

The words "substantial" or "substantially" are relative, inexact terms. Their meaning is quite elusive. *Application of Scroggins,* 103 Cal.App.2d 281, 229 P.2d 489 (1951). The meaning of such terms can be derived only be reference to all the circumstances surrounding the context in which they are used. *Atcheson, T. & S.F. Ry. v. Kings County Water District,* 47 Cal.2d 140, 302 P.2d 1, 3 (1956). So here, we believe that the term "substantially the same measure" must be viewed against the total structure contemplated in Art. XI of our constitution in the matter of direct legislation.

It is evident that the framers wanted to avoid a constitutional system in which any and all types of law could be enacted by direct legislation. Thus they placed a number of specific restrictions upon its use. Art. XI, Sec. 7, states:

> "The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation. The referendum shall not be applied to dedications of revenue, to appropriations, to local or special legislation, or to laws necessary for the immediate preservation of the public peace, health, or safety."

A less absolute, more relative restriction on the use of the initiative comes about by reason of the language which must be construed in the case at bar. By providing that the legislative enactment of substantially the same measure could have the effect of voiding an initiative, the framers empowered the legislature to cut off initiated legislation from consideration and vote by the general public. The manner in which Art. XI, Sec. 4, was amended in the constitutional convention makes this clear. The original proposal at the convention would have required that an initiative could be voided only by legislative enactment of "the measure initiated". Read lit-

erally, this would require that the language of both measures be identical. However, as discussed above, the final constitutional language requires merely that "substantially the same measure" be enacted by the legislature in order to void an initiative petition.

It is clear that the legislative act need not conform to the initiative in all respects, and that the framers intended that the legislature should have some discretion in deciding how far the legislative act should differ from the provisions of the initiative. The question, of course, is how great is the permitted variance before the legislative act becomes no longer substantially the same.

▮ Upon reflection we have concluded that the legislature's discretion in this matter is reasonably broad. If in the main the legislative act achieves the same general purpose as the initiative, if the legislative act accomplishes that purpose by means or systems which are fairly comparable, then substantial similarity exists. It is not necessary that the two measures correspond in minor particulars, or even as to all major features, if the subject matter is necessarily complex or if it requires comprehensive treatment. The broader the reach of the subject matter, the more latitude must be allowed the legislature to vary from the particular features of the initiative.

We are fortified in this understanding of the constitutional language, and the intention of the framers, by a companion provision of the constitution. Under Art. XI, Sec. 5, an initiative, once enacted, cannot be repealed by the legislature within two years of its effective date. But it may be amended at any time. Here, as with Art. XI, Sec. 4, a considerable change occurred in the constitutional convention in the language first proposed and that finally adopted. Committee Proposal No. 3 (Committee on Direct Legislation, Amend-

---

stitutional convention as part of the statehood movement. Nothing in that background, however, has any direct bearing on how the

term "substantially the same measure" should be interpreted.

ment and Revision, December 9, 1965), provided:

"No law passed by initiative may be vetoed by the Governor nor amended or repealed by the legislature for a period of three years."

The final constitutional provision states in pertinent part:

"An initiated law . . . is not subject to veto, and may not be repealed by the legislature within two years of its effective date. It may be amended at any time . . . ."

The constitution thus vests broad authority in the legislature to vary the terms of an initiated law, after its adoption, by the process of amendment. This power amounts to a check or balance against the initiative process. No doubt the legislature was given this power to assure that initiatives which were ill-advised, which might seriously cripple or frustrate the sound workings of government, or which might be impracticable, could be altered or corrected rapidly by the legislature. It was obviously intended by the framers that the initiative process should not be permitted to disrupt vital governmental functions or to impose intolerable burdens upon established administrative systems. To this end the legislature was given the ability to substitute its judgment for that of the proponents of an initiative.[16]

What is significant to us here is the effect which the amendatory power of the legislature has upon our interpretation of the words "substantially the same mea-

sure." For if the legislature has broad power of amendment, it follows that it has broad power to change an initiative by an enactment covering the same subject as the initiated measure. In short, we must interpret Art. XI, Sec. 4, broadly and not narrowly as to the scope of legislative power. We, of course, are not passing here on the question of whether an amendment so vitiates an act passed by initiative as to constitute its repeal.

Turning now to the initiative and legislative act before us, it is clear that they both cover the same general subject matter. Both are aimed at the control of election campaign contributions and expenditures. The main points of similarity in the two measures are these: The amount a candidate may spend on his campaign is limited; contributions and expenditures must be reported; contributions of $100 or more under the act, and all contributions under the initiative, must be reported; the persons covered include candidates for governor, lieutenant governor, and state legislature;[17] criminal misdemeanor penalties are imposed for the violation of the respective provisions of both measures;[18] acceptance of anonymous contributions is prohibited; a responsible campaign treasurer must be appointed by each candidate; certain violations under each measure work a forfeiture of nomination or election; required reports must be made available for inspection by the public; and provision is made for citizen enforcement of the law, by court action under the initiative, and under the act by a complaint to the elec-

16. The discussions on the floor of the constitutional convention reveal a belief by a number of framers that a countervailing consideration would act as a balance against legislative arbitrariness in this respect. It was believed that the natural desire of many legislators to be re-elected, or at least to demonstrate creditable performance as public officials, would cause them to think carefully before amending an initiative out of existence, because of the effect which such action might have on the electorate in the future.

17. The initiative covers all municipal elections. The act permits a municipality to exempt it-

self from the coverage of the law. The initiative covers candidates for Congress, while the act does not. It should be noted that candidates for federal office are regulated extensively by the federal election campaign disclosure act passed in 1972. *See* 2 U.S.C. §§ 431–454.

18. AS 15.13.120(a) imposes penalties of up to one year of imprisonment or a fine up to $5,000 for violation of the act. We do not view the act, as does the dissent, as eliminating almost all individual penalties for enforcement.

tion compaign commission and appeal to the supreme court.

Under the initiative a watchdog committee is created, composed of three members of each major political party and three independent persons, plus one member from any other recognized political party. The ultimate appointive authority as to the committee is in the governor. Under the act there is created an election campaign commission. The governor appoints to the commission two members from each major political party, and they select by majority vote a fifth member.

There are certain points of contrast between the two measures. The initiative places most of the supervisory and administrative responsibilities on the lieutenant governor. The act places these functions in the election campaign commission. The initiative requires commercial advertisers to file reports of political advertising; the act does not require this. The initiative attempts to place out-of-state contributors under the jurisdiction of the Alaska courts; the act is silent on this subject.[19] The act defines and regulates political groups formed to support or oppose a political candidacy; the initiative does not reach such groups. Under the act a $1,000 limit is placed upon individual contributions; the initiative imposes no limit. Under the initiative candidates for governor and lieutenant governor cannot use more than 40% of their expenditures for "communications media." The act contains no such limitation.

The dissent views the act as eliminating all subpoena or investigatory power of the watchdog committee. However, the act, AS 15.13.030, requires that the commission must receive and hold open for public inspection the reports filed under the act. The commission is empowered to adopt regulations necessary to effectuate and clarify the act, and to conduct investiga-

tions of claimed violations of the act. AS 15.13.030(10) and .120(d). If the commission finds that violations have occurred it must report them to the attorney general for action. The attorney general may, of course, obtain subpoenas by resort to grand jury proceedings. We do not view the act as hampering investigation and prosecution of prohibited activities. Therefore, the elimination of the watchdog committee's subpoena power does not, in our opinion, create a significant difference between the two measures.

We are unable to accept the view, expressed in the dissent, that enforcement of the act will be less effective because violations must be referred to the attorney general. The practical or political problems posed by that method of enforcement, as contrasted with the watchdog committee envisaged by the initiative, may not in actuality operate as a serious barrier to enforcement. To some extent such problems inhere in the process of criminal prosecution generally. The countervailing forces are an aroused public opinion and the constitutional obligation resting on the executive to see that the laws are faithfully executed. These forces are operative in the processing of criminal matters of all types. We will not assume that practical or political considerations will frustrate effective enforcement.

The act does not place limitations on media spending, does not impose reporting requirements on media, does not require permits for media advertising, and does not provide for the reporting of surplus funds collected, in the same manner as does the initiative. But that is not to say that these subjects are unregulated. Under AS 15.-13.110(d) all persons supplying services to any candidate must maintain a record of each transaction and must file appropriate reports with the commission. While the act does not limit the amount of media

---

19. This does not mean that out-of-state contributions go unregulated. Under the act these contributions must be reported; they may not exceed $1,000 in the aggregate per annum for any one candidate; and it is a criminal offense to accept a contribution in violation of the act. See AS 15.13.040, .070, and .120(a) (6).

spending, it does limit total spending by any candidate. Surplus funds will be reported under AS 15.13.110 which requires that a report shall be filed on December 31 of each year for expenditures and contributions not reported earlier in that year.

That the act contains no requirement for equal charges by media and equal time to candidates is moderated in part by applicable federal law. Under 47 U.S.C. Sec. 315(a)(2) a broadcasting licensee must afford equal opportunity to all other candidates for a given office.[20]

The power of the watchdog committee to delay certification of candidates or to bring charges requiring a delay of certification has been eliminated in the act. But the act declares void the nomination or election of a condidate who violates the act, and provides for an expeditious judicial procedure to determine such cases.

Both measures control the total amount of expenditures by candidates as to primary and general elections. The specific amounts limited in each measure vary. As to the candidates for governor and lieutenant governor the amounts work out nearly the same.[21] As to candidates for the House the initiative limits expenditures to $6,000, while the act limits them to about $7,000. The initiative limits Senate campaign expenditures to $8,000, while the formula used under the act results in a limit of about $14,000.

In short, the statute is not a hollow gesture toward the regulation of election campaigns. It sets up workable machinery to ensure compliance. Quite possibly the legislature felt that an election campaign commission could better handle the prescribed administrative and supervisory duties than could the lieutenant governor, and that such a commission would be more effective than the watchdog committee contemplated by the initiative. In making such a choice the legislature would not be vitiating the aims of the initiative but making those aims more feasible of achievement.

Various other differences can be found in the two measures, but they are not significant enough to make a material difference in our decision.

Viewing the two measures as a whole we find that they accomplish the same general goals. They adopt similar, although not identical, functional techniques to accomplish those goals. The variances in detail between the measures are no more than the legislature might have accomplished through reasonable amendment had the initiative become law. Nothing is present here to suggest that the act was a subterfuge to frustrate the ability of the public to obtain consideration and enactment of a comprehensive system to regulate election campaign contributions and expenditures.[22] No doubt other changes will be made in the law, in response to newly perceived needs and in the light of experience gained in the administration of the act. The same would be true had the initiative been placed upon the ballot and become law.

---

20. See *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), for an exposition of the fairness doctrine, which is distinct from the statutory equal time requirement.

21. The proposed initiative, Sec. 2(a)(1) limits expenditures by or on behalf of a candidate for governor or lieutenant governor to exactly $125,000. The legislative enactment, AS 15.-13.070(f)(1) utilizes a formula which limits expenditures by or on behalf of a candidate for governor or lieutenant governor to "40 cents times the total population of the state according to the latest United States census figures . . . ." The official United States Decennial Census, last taken in 1970, sets the population of the State of Alaska at 302,173. Thus candidates for governor and lieutenant governor would be restricted to expenditures of $120,869.20 under the legislative act, as compared with $125,000 under the proposed initiative.

22. On the contrary, a number of differences between the initiative and the act can be explained by the possibility that the legislature might have regarded certain features of the initiative to be subject to constitutional attack or to be practically unworkable. We do not, however, express an opinion on the constitutionality of any of the particular provisions of either measure.

■ It is our opinion that substantial similarity exists between the two measures. The act effectively displaced the initiative. The lieutenant governor was correct in withholding the initiative from the ballot. We affirm the judgment of the superior court.

Affirmed.

ERWIN and BURKE, JJ., dissent.

ERWIN, Justice, with whom BURKE, Justice joins, dissenting.

I dissent.

The power of initiative and referendum is the basic recognition that under our republican form of government the ultimate political power exists with the people and not in some legislative body.[1] These provisions permit the people to enact laws when the legislature refuses to act, or repeal acts of the legislature which are unpopular or unfair. Moreover, it is an additional check and balance on the governmental process because it acts upon the legislative awareness that such power exists with the people[2]

One set of critics at the constitutional convention claimed, however, that its limitations make it less than effective as a popular tool of government. They argued that the requirement of obtaining a large number of signatures from residents in order to put the issue before the voters significantly limited the use of the initiative process in all but a few cases.[3]

Now the majority opinion further restricts this process by countenancing substantial legislative limitation of the initiative procedure. When this court determines that the legislature may decide how much of the legislation supported by the people they want, the basic political right of initiative disappears, for it is not the will of the people that is paramount, it is the will of the legislature.

I find that the minutes of the Alaska constitutional convention and the commentary thereon are not as limited as the majority opinion indicates.

The initial proposal filed by the Committee on Direct Legislation contained the following language:

. . . Laws proposed by the initiative shall be submitted to the voters by ballot title at an election not later than 180 days after the adjournment of the legislative session following the filing of the petition, unless the legislature enacts the measure initiated during the session. . . .[4]

In the accompanying commentary the committee explained the content of the legislative enactment in the following terms:

If the legislature adopts a measure *that is the subject of the initiative,* the measure does not have to be submitted to the people. [emphasis added][5]

The discussion and amendment of this initiative proposal was perhaps the most extensive and hotly contested[6] of the entire constitution, covering 7½ days of proposals and counter proposals.[7] This discussion included an extensive debate on the power to amend as being the power to amend and not the power to destroy.[8]

1. 2 Alaska Constitutional Convention Proceedings, 931–975. See particularly the statements of Delegates Marston and Taylor, 959–961, before defeat of the motion to delete all reference to referendum in the article on 973.

2. Fischer, Alaska Constitutional Convention, 79–81 (University of Alaska Press, 1975).

3. *Id.* at 79.

4. 6 Alaska Constitutional Convention Proceedings, 19.

5. *Id.* at 23; 2 Alaska Constitutional Convention Proceedings, 929.

6. Fischer, *supra* note 2, at 79–81.

7. 2 Alaska Constitutional Convention Proceedings, 928–1200; 3 Alaska Constitutional Convention Proceedings, 2960–2993.

8. 2 Alaska Constitutional Convention Proceedings, 1173–1177.

Subsequently the convention changed the proposal to provide as follows:

A referendum petition may be filed at any time. The secretary of state shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing. If, *before* the election, *substantially the same measure has been enacted,* the petition is void.[9] [emphasis added]

The majority opinion finds this constitutional history inclusive and suggests that it may be supportive of the conclusion that the convention intended to give wide latitude to the legislature to change the initiative. I find it supports the exact opposite conclusion because of the extensive debate on the convention floor concerning the need for the initiative process, which was the subject of public hearings during the Christmas recess of the constitutional convention.

Further, the political climate of Alaska preceding, during and after the constitutional convention does not support a theory of distrust of the popular electorate or the legislation it would sponsor. Alaska's history is replete with instances of frustration to get an absentee government in Washington to deal with pressing problems.[10] In fact, such inaction was the greatest single boost to statehood. The members of the Alaska constitutional convention understood, more than most, the necessity of the initiative process for unpopular acts—for without it, the long years of struggle to achieve local control over our political destiny would have been cheapened.

In this case the legislature took the initiative title and enacted a measure which clearly was more politically palatable to them, but which is definitely not "substantially the same" as the initiative sponsored by the people.

In reviewing the referendum and the statute, I find that of the 19 separate sections of the initiative, only six are the same as the statute, and as part of the six I am including the section dealing with the powers and duties of the watchdog committee and the reporting system, which is only 50% of that stated in the initiative.

Seven sections have been eliminated entirely by the statute. This includes:

1. All references to United States senators and congressmen.[11]

2. Coverage of local elections is changed to local option.[12]

3. The requirement that out-of-state contributors submit themselves to Alaska jurisdiction.[13]

4. Almost all individual penalties for enforcement of the provisions of the act.[14]

5. All subpoena or investigatory power of the watchdog committee.[15]

6. All limitations on media spending.[16]

7. All requirements for equal charges by media and for equal time to candidates.[17]

8. Almost all reporting requirements by media, as well as all requirements that permits be obtained before media advertising is undertaken by a candidate.[18]

9. All requirements for the reporting and disposition of surplus funds collected.[19]

9. Section 4, Article XI, Alaska Constitution.

10. Gruening, *Many Battles*, pp. 281–396 (Liveright 1973); Gruening, *The State of Alaska,* Chapter 28: "Self Government: The Quest for Statehood," p. 460 (Random House 1954).

11. Section 2 of Initiative.

12. Section 18 of Initiative.

13. Section 13 of Initiative.

14. Sections 7 and 19 of Initiative.

15. Section 4 of Initiative.

16. Section 2 of Initiative.

17. Section 16 of Initiative.

18. Sections 5, 6 and 15 of Initiative.

19. Section 10 of Initiative.

10. Most definitions and the statement of purpose.[20]

In addition, the dollar amount of expenditures has been changed in every instance to a higher figure.

Governor/Lt.

| | | |
|---|---|---|
| Governor | $125,000 to | $130,000 |
| House | 6,000 to | 7,500 |
| Senate | 8,000 to | 15,000 [21] |

Whereas the initiative required the disclosure of persons who contributed in excess of $50 to a candidate, the measure passed by the legislature requires only contributors of $100 or more need to be identified and reported.[22] Moreover, every section dealing with failure to report, false reports, or perjury in reporting has been deleted, together with those provisions which provide for substantial fines for all people who refuse access to the records of a candidate.[23] In addition, all sections permitting citizens to sue to enforce the provisions of the initiative have been eliminated.[24]

All power of the watchdog committee to delay certification of candidates or to bring charges requiring a delay of certification has been eliminated,[25] as has the power of the court to declare the second highest vote-getter elected where expenditure violations were found.[26]

Additionally, the legislature removed most enforcement teeth by requiring that any violation found by the commission must be referred to the Attorney General for a decision of whether or not the violator would be prosecuted.[27] The discretion to prosecute is an area of intense controversy, but such clearly depends upon factors outside the issue of whether or not a violation has occurred.[28] Such things as the manpower of the office, the priority of work, and the seriousness of other problems[29] can combine to make enforcement of this area somewhat improbable. To these practical problems is added a political reality which casts shadows over the decision to prosecute or not to prosecute. The Attorney General is appointed by the Governor; thus there is an unknown political factor which can effect the decision where the candidate or issue is one approved by the political party in power.

While the act does not explain how the watchdog committee will obtain evidence of violations without investigative or subpoena power, the statute is clear that there is no method of delaying certification or removing a candidate who is in violation without a court proceeding.[30] Further, any case for voiding the election filed by the Attorney General must then be heard by the Supreme Court of Alaska as an original proceeding,[31] rather than in the normal way of all other cases in the District or Superior Court. Since the Supreme Court must sit as five judges, it is a cumbersome body to hear fact disputes, particularly in view of its divided geographic situs and other work load. This process becomes even more cumbersome and somewhat questionable if constitutional rights of jury trial in certain cases[32] and

20. Sections 1 and 20 of Initiative.

21. Section 2 of Initiative. The majority refers to the last decennial census of 1970 to suggest $120,000 as the figure for Governor. However, constantly new census figures are validated to show changes for federal-state revenue-sharing purposes. The latest figures for 1975 make the $130,000 figure conservative.

22. Section 9 of Initiative.

23. Section 7 of Initiative.

24. Section 19 of Initiative.

25. Section 3 of Initiative.

26. Section 19 of Initiative.

27. AS 15.13.120(d).

28. See *Public Defender Agency v. Superior Court of Third Judicial District*, 534 P.2d 947, 949–951 (Alaska 1974), for a discussion of the Attorney General's discretion to decline prosecution in child support cases.

29. Fischer, *supra* note 3, at 949.

30. AS 15.13.120(b).

31. AS 15.13.120(b).

32. See *Baker v. City of Fairbanks*, 471 P.2d 386, 401–402 (Alaska 1970), for a discussion of cases where jury trial is required.

statutory rights[33] to appeal all cases to the Supreme Court are considered.

The initiative recognized these problems by permitting the commission and private parties to bring suit to enforce its provisions and gave to the committee investigative and subpoena power to insure compliance. The elimination of these provisions goes to the heart of the enforcement provision and leaves, to a large extent, an illusory remedy. The initiative and the measure passed by the legislature have the same title and some similar reporting requirements, but by no stretch of the imagination are they substantially the same.[34]

The majority attempts to excuse the need for a number of the deleted sections by noting that certain federal reporting requirements or court decisions make them unnecessary. While disregarding the proposition that federal laws can provide effective regulation for Alaska elections when all complaints must be filed in Washington, D.C., I submit that this argument misses the point. The question is not whether the provisions are wise, but whether the legislative act is *substantially* the same as the initiative. It is for the people to provide the decision in situations such as this because the legislature failed to act until prodded by the electorate. By their inaction the legislators simply lost their ability to challenge the utility of the provisions. Their only power was to nearly duplicate the initiative, for that is just what the words "substantially the same" mean.

The majority's final suggestion that the powers and duties referred to in several of the eliminated sections can be implied from other provisions of AS 15.13 flies in the face of two canons of construction which have been adopted in almost every jurisdiction: (1) criminal statutes are to be strictly construed, and (2) where there has been a material change in language of an act, it is presumed that the legislature intended to indicate a change in legal rights and obligations thereunder.[35]

I agree with the implication of the majority opinion that the sections eliminated affect the workings of the commission and various other provisions throughout the statute. However, I am unable as a matter of logic to find the flexibility in the act passed by the legislature to cover the gaps left by those sections deleted from the original initiative.

I would reverse the decision of the trial court and remand this case with instructions to place the initiative on the ballot of the next general election.

---

33. AS 22.05.010.

34. The only similar sections found in AS 15.13.010–110 provide for
    (1) a monitoring committee (.020 to .030);
    (2) the reporting of contributions over $100.00 (.040);
    (3) the registration of groups and the appointment of a treasurer (.050 and .060);
    (4) limitations of spending by candidates in various races (.070);
    (5) certain reporting requirements of contributors and a schedule for candidates (.080 to .110).

Additionally, the legislature added a tax credit of $50.00 from state income tax for political contributions. Also, publication of an election pamphlet containing background information on the candidates, costing each House candidate $25.00 and each Senate candidate $50.00.

35. *See* Horack, Sutherland Statutory Construction, Vol. 1, § 1930, p. 412–414 (3rd Ed.1943).